WISCONSIN EMPLOYMENT RELATIONS BOARD, Plaintiff, vs. MILWAUKEE GAS LIGHT COMPANY and others, Defendants. [Two appeals.]

*October 5—November 8, 1950.*

For the plaintiff there was a brief by the *Attorney General,*
*Stewart G. Honeck,* deputy attorney general, and *Malcolm L.*

*Riley,* assistant attorney general, and oral argument by *Mr. Riley.*

For the defendant Milwaukee Gas Light Company and its officers there was a brief by *Miller, Mack & Fairchild,* and oral argument by *J. G. Hardgrove,* all of Milwaukee.

*Max Raskin,* attorney, and *William F. Quick* of counsel, both of Milwaukee, for the defendants United Gas, Coke & Chemical Workers of America, District 7, Local Union 18, C.I.O., and Arthur St. John, Chester Walczak, and Thomas Lansing.

MARTIN, J.   Prior to October 5, 1949, the membership of the union had authorized the negotiating committee to call a strike and on October 4, 1949, the negotiating committee, consisting of defendants, Arthur St. John, Thomas Lansing, and Alvin C. Fuhrman, ordered the strike to commence at 6 a.m., October 5, 1949.

At 11 a.m. the public was advised to curtail consumption of gas and an appeal to consumers of gas was made to shut off the service; the steam pressure dropped to zero in the boiler room and no further pumping could be done with the main pumping facilities; the fires had to be pulled from the boilers reducing the steam pressure, and all facilities had to be stopped; a minimum pressure in the distribution system was kept in order that the air would not get into the mains so as to prevent any explosions due to the mixture of gas and air in the distribution system; the send-outs dropped to twenty-five per cent of what they had been previously.  Low pressure in the system created a dangerous condition fraught with the possibility of infinite injury to the public.  The public was advised by radio broadcasts and through the newspapers to shut off appliances and to shut off the service at the meter. The service was not resumed until October 6, 1949.

The restraining order was signed by the court at 12:55 p.m. and was served by the deputy sheriff upon the union, by

serving its president, Arthur St. John, and upon him personally, and upon Chester Walczak, international representative, at a meeting of a large group of the members of the union at Bohemian Hall, at about 2 p.m., October 5th. Chester Walczak and Arthur St. John told the meeting the papers served were an order to go back to work, but no statement was made calling the men back to work.

A picket line was maintained at the premises of the Coke Company from 2 or 3 p.m. and continued there until about 9:30 p.m. on Wednesday, October 5, 1949.

The Coke Company is a wholly owned subsidiary of the Gas Company. In October, 1949, the Coke Company supplied about fifty-five to sixty per cent of the gas distributed by the Gas Company. Because of the relationship between the Coke Company and the Gas Company, the Coke Company is a public-utility employer and the public-utility antistrike law applies to it.

The present proceeding does not relate back to the action of the union voting the strike, or to the act of the negotiating committee calling the strike. It relates to matters occurring subsequent to the signing of the order and the service of same at about 2 p.m. on October 5th.

The order required the union, St. John, Walczak, and Lansing to "take immediate steps to notify all employees called out on strike to resume service forthwith." Because of the seriousness of the situation already referred to resulting from the partial or complete stoppage of the essential service of furnishing gas to the public, the order required immediate compliance.

On Arthur St. John, president of the union, a member of the executive board and of the negotiating committee, Thomas Lansing, a member of the executive board and the negotiating committee, and Alvin C. Fuhrman, vice-president of the union and a member of the executive board and nego-

tiating committee, was placed the responsibility by vote of the union to call the strike and upon them rested the responsibility, after the service of the restraining order, to revoke the call and comply with the order of the court.

An all-night conference between union and Gas Company officials, in which the mayor of Milwaukee and the judge of the United States district court for the Eastern district of Wisconsin participated, was held on October 5th and an agreement was reached. The strike ended at 8 a.m., October 6th. The defendants contend that a call to the members of the union to return to work would have been ineffectual; that they knew beyond any reasonable doubt that any order, request, or recommendation of theirs would, under the circumstances then existing, have no effect whatever in getting the men back to work. They assert that there was no contumacious or wilful disobedience of the order because they immediately took action and arranged a conference in which the strike was settled, and there was only a few hours' delay in achieving the main objective of the order, which was to end the strike and get the production of gas and its distribution to consumers back to normal. These measures are not a justification for their failure to comply with the requirements of the court order.

It is true that within twenty hours the strike was settled by negotiations. However successful the negotiations may have been, it does not purge the defendants. The language of the court order is direct and unambiguous. It commanded something to be done—"take immediate steps to notify all employees called out on strike to resume service forthwith." This the defendants ignored.

The acts complained of which violated the injunction constituted contempt of court and are held to have injured the board. See *Wisconsin E. R. Board v. Allis-Chalmers W. Union* (1946), 249 Wis. 590, 25 N. W. (2d) 425.

Defendant Chester Walczak at the time in question was a regional director of the international union, but he was not a member of the negotiating committee. The immediate duty to recall the strike did not rest upon him as it did upon the members of the negotiating committee. It does not appear that his failure to disassociate himself from the continuance of the strike was an act of wilful and contumacious civil contempt.

We have carefully reviewed the evidence relating to the other thirteen union members who were dismissed in this action. No useful purpose would be served in discussing each individually. They were either present at the meeting at the Bohemian Hall or in the picket line at the Coke Company when the court order was served. The evidence does not so clearly and sufficiently establish their knowledge of the scope and requirements of this order so as to overrule the finding of the trial court. The members of the negotiating committee did not sufficiently inform them of the requirements. This finding by the trial court is a reasonable deduction from the testimony produced and must stand. The court's finding is of great weight. Its conclusion after seeing the witnesses and hearing their testimony cannot be disturbed.

The union asserts that subch. III of ch. 111, Stats., conflicts with the Federal Labor Management Relations Act of 1947, 29 USCA, sec. 141 *et seq.*, and violates the state and federal constitutions.

The constitutionality of the public-utility antistrike law was questioned in a previous action in this court. *United G., C. & C. Workers v. Wis. E. R. Board* (1949), 255 Wis. 154, 38 N. W. (2d) 692. The law has been held to be a proper legislative enactment.

The union relies on *International Union of U. A. A. & A. v. O'Brien* (1950), 339 U. S. 454, 70 Sup. Ct. 781, 94 L. Ed. 978 (same case below, 325 Mich. 250, 38 N. W. (2d)

421.), wherein the constitutionality of the strike-vote provision of the Michigan Labor Mediation Law was before the court. The appellants struck against the Chrysler Corporation in May, 1948, without conforming to the prescribed state procedure. The United States supreme court stated that even if some state legislation in this area could be sustained, the particular statute before it could not stand for it conflicts with the federal act. It was explicitly pointed out that congress had considered in enacting the federal act, and expressly rejected, on its merits, the proposition that a strike vote ought to be prerequisite of a strike.

The lower court considered that the state police power could operate even though some of the members of the same bargaining unit were employed in Chrysler plants in California and Indiana, as well as Michigan. The United States supreme court is bound by the state court's interpretation of the state statute. As so interpreted, it was held that the Michigan provision conflicted with the exercise of federally protected labor rights. The court said that the regulation of the right to peacefully strike for higher wages had been preempted by congress.

The above case, however, relates to a private corporation whereas the instant case involves a public utility engaged in the furnishing of illuminating and heating gas to the general public in the state of Wisconsin. The total franchise area served exceeds five hundred square miles. The total population of the area is nearly eight hundred thousand. The number of customers exceeds two hundred thousand, all within the state of Wisconsin. Congress has no power to question the states' control over their utilities. That power rests with the states. The states exercise such powers on the theory that the utilities are state agencies. They perform functions which the states might perform directly rather than through agencies to which they delegate their own powers.

Under a proper interpretation of the federal act, the state is still sovereign in the field covered by the public-utility antistrike law. The federal act makes provision for national emergencies, but it does not and cannot legislate in the field of local emergencies.

The *O'Brien Case, supra,* was considered by this court in defendant's motion for rehearing in *United G., C. & C. Workers v. Wis. E. R. Board, supra,* wherein the constitutionality of the public-utility antistrike law was first questioned.

In the case *In re New Jersey Bell Telephone Co.* (October 2, 1950), 5 N. J. 354, 75 Atl. (2d) 721, 26 LRRM 2585, it was held that the New Jersey Public Utilities Disputes Act, which forbids those strikes against public utilities which might imperil health and welfare, does not conflict with provision in the Labor Management Relations Act which establishes emergency strike procedure for disputes affecting national safety and health, since federal law does not authorize the federal government to intervene in emergencies of state-wide proportions only, and there is nothing in federal law forbidding intervention by states in such situations. The telephone company relied on the *O'Brien Case, supra,* and the New Jersey supreme court stated:

"In that case the constitutionality of the strike vote provision of the Michigan Labor Mediation Law was questioned. The union had struck against a private industrial organization, engaged in interstate commerce, without conforming to the prescribed state procedure; the state procedure differed from that provided in the federal legislation and the court decided that because of the conflict the state statute was unconstitutional. The court said that the regulation of the right to peacefully strike for higher wages had been pre-empted by congress, but the case being decided by the court involved a statute regulating the right to strike against private industry. It was not a statute such as the New Jersey statute, in which a state, in the exercise of its sovereignty, seeks to maintain

without interruption the supply of services, considered essential to the welfare and health of its people, being furnished by a public utility, operating under a franchise by the state, whose services furnished are primarily intrastate. It is significant that in the *O'Brien Case, supra,* the court said 'Even if some legislation in this area could be sustained, the particular statute before us could not stand. For it conflicts with the federal act.' Our examination of the federal act discloses no provision therein which prohibits a state, in the exercise of its police power, from protecting itself against strikes or lockouts in public utilities which would imperil the health and safety of its citizens. It is noted that the Labor Management Relations Act, 1947, in sections 206–210, authorizes the federal government to proceed, pursuant thereto, to enjoin threatened strikes or lockouts which, if permitted to occur, might imperil the national health or safety. We find no authority in the federal act for the federal government to so act to prevent similar emergencies which may be state-wide only and which may be of insufficient magnitude to imperil the national health and safety. Since we find no provision in the federal act prohibiting a state from enjoining threatened strikes or lockouts in public utilities which, if permitted to occur, might imperil the health, welfare, and safety of its people in an emergency of state-wide proportions only, since the federal act does not authorize the federal government to act in such cases, and since the 'intention. of congress to exclude the states from exerting their police power must be clearly manifested,' *Allen-Bradley Local v. Wisconsin Employment Relations Board,* 315 U. S. 740, 86 L. Ed. 1154 (1942), we conclude that the right of the states to prohibit strikes or lockouts in this sphere has not been pre-empted by congress, and that the *O'Brien Case, supra,* is inapplicable to the present situation."

We concur with the New Jersey supreme court that the power still resides in the states in a proper case to prohibit strikes notwithstanding the existing federal legislation. We consider this a "proper case" within the foregoing statement

and find nothing in the *O'Brien Case, supra,* of a dissuasive nature. We hold that the public-utility antistrike law does not conflict with any federal act.

*By the Court.*—Judgment affirmed.

FAIRCHILD, J., took no part.