# AMALGAMATED ASSOCIATION OF STREET, ELECTRIC RAILWAY & MOTOR COACH EMPLOYEES OF AMERICA, DIVISION 998, ET AL. v. WISCONSIN EMPLOYMENT RELATIONS BOARD.

NO. 329.

Argued January 9–10, 1951.—Decided February 26, 1951.

David Previant argued the cause and filed a brief for petitioners in No. 329.

Arthur J. Goldberg argued the cause for petitioners in No. 438. With him on the brief were Thomas E. Harris and Max Raskin.

Malcolm L. Riley and Beatrice Lampert, Assistant Attorneys General of Wisconsin, argued the cause for respondent. With Mr. Riley on the brief were Vernon W. Thomson, Attorney General, Thomas E. Fairchild, then Attorney General, and Stewart G. Honeck, Deputy Attorney General.

Briefs of amici curiae urging reversal were filed by Solicitor General Perlman, David P. Findling and Mozart G. Ratner for the National Labor Relations Board; and J. Albert Woll, James A. Glenn and Herbert S. Thatcher for the American Federation of Labor.

Briefs of amici curiae urging affirmance were filed by Harold R. Fatzer, Attorney General, for the State of Kansas; Clarence S. Beck, Attorney General, and Bert L. Overcash, Assistant Attorney General, for the State of Nebraska; Theodore D. Parsons, Attorney General, and Benjamin C. Van Tine for the State of New Jersey; and Charles J. Margiotti, then Attorney General, and M. Louise Rutherford, Deputy Attorney General, for the State of Pennsylvania.

Mr. Chief Justice Vinson delivered the opinion of the Court.

In these cases, the constitutionality of labor legislation of the State of Wisconsin known as the Public Utility Anti-Strike Law,[1] has been drawn in question.

Petitioners in No. 329 are the union and its officers who represent the employees of the Milwaukee Electric Railway and Transport Company of Milwaukee, Wisconsin, for collective-bargaining purposes.[2] For many years, the transit workers entered into collective-bargaining agreements with the transit company without resorting to strike. In 1948, however, the collective agreement was terminated when the parties were unable to agree on wages, hours and working conditions and the transit workers' union called a strike to enforce union demands. The respondent Wisconsin Employment Relations Board secured immediately an *ex parte* order from a State Circuit Court restraining the strike and, in compliance with that order, the union postponed its strike. Thereafter, the same Circuit Court entered a judgment under which petitioners are "perpetually restrained and enjoined from calling a strike . . . which would cause an interruption of the passenger service of the [transit company]." The Wisconsin Supreme Court affirmed the judgment, 257 Wis. 43, 42 N. W. 2d 471 (1950), and we granted certiorari, 340 U. S. 874 (1950), to review the important questions decided below.

---

[1] Wis. Stat., 1949, §§ 111.50 *et seq.*

[2] The National Labor Relations Board has exercised jurisdiction over the transit company and its employees in conducting a so-called union shop election pursuant to § 9 (e) (1) of the Labor Management Relations Act of 1947, 29 U. S. C. (Supp. III) § 159 (e) (1). The National Labor Relations Board is presently investigating a charge filed by the transit workers' union in respect to an alleged unfair labor practice said to have been committed in respect to the controversy out of which this case arose.

Petitioners in No. 438 are the union and its officers who represent employees of the Milwaukee Gas Light Company and its subsidiary, the Milwaukee Solvay Coke Company, both of Milwaukee, Wisconsin, pursuant to a certification of the National Labor Relations Board.[3] In 1949, the collective agreement between petitioners and the gas company was terminated and, upon failure of further bargaining and conciliation to resolve the dispute, a strike was called and the gas workers left their jobs. Respondent Wisconsin Employment Relations Board obtained forthwith an *ex parte* restraining order from a State Circuit Court requiring that petitioners "absolutely desist and refrain from calling a strike [or] going out on strike . . . which would cause an interruption of the service of the [gas company]" and ordering petitioners to "take immediate steps to notify all employes called out on strike to resume service forthwith." Although the strike was settled soon thereafter, the Circuit Court found that petitioners had not obeyed the restraining order and entered a judgment of contempt, imposing fines of $250 upon each petitioner. The Wisconsin Supreme Court affirmed that judgment, 258 Wis. 1, 44 N. W. 2d 547 (1950), and we granted certiorari, 340 U. S. 903 (1950), since this case raises the same substantial questions as those before the Court in No. 329.

The injunctions were issued in each case upon the complaint of the Wisconsin Employment Relations Board, charged by statute with the enforcement of the Public Utility Anti-Strike Law. That act vests in the state

---

[3] *Milwaukee Gas Light Co.,* 50 N. L. R. B. 809, as amended, 52 N. L. R. B. 1213 (1943). The N. L. R. B. has also conducted a union shop election under § 9 (e) (1) of the Federal Act, *supra,* note 2, in respect to the supervisory employees of the gas company. And a union complaint that the gas company committed an unfair labor practice in respect to the dispute out of which this proceeding arose has been filed with the N. L. R. B.

circuit courts jurisdiction to enjoin violations of the act, Wis. Stat., 1949, § 111.63, the substantive provision involved in these cases providing as follows:

> "It shall be unlawful for any group of employes of a public utility employer acting in concert to call a strike or to go out on strike, or to cause any work stoppage or slowdown which would cause an interruption of an essential service; it also shall be unlawful for any public utility employer to lock out his employes when such action would cause an interruption of essential service; and it shall be unlawful for any person or persons to instigate, to induce, to conspire with, or to encourage any other person or persons to engage in any strike or lockout or slowdown or work stoppage which would cause an interruption of an essential service. Any violation of this section by any member of a group of employes acting in concert or by any employer or by any officer of an employer acting for such employer, or by any other individual, shall constitute a misdemeanor." Wis. Stat., 1949, § 111.62.[4]

---

[4] Under Wis. Stat., 1949, § 111.64, the following is applicable to the above provision:

"Nothing in this subchapter shall be construed to require any individual employe to render labor or service without his consent, or to make illegal the quitting of his labor or service or the withdrawal from his place of employment unless done in concert or agreement with others. No court shall have power to issue any process to compel an individual employe to render labor or service or to remain at his place of employment without his consent. It is the intent of this subchapter only to forbid employes of a public utility employer to engage in a strike or to engage in a work slowdown or stoppage in concert, and to forbid a public utility employer to lock out his employes, where such acts would cause an interruption of essential service."

We have before us, then, a statute aimed only at "concerted" activities of public utility employees.

This provision is part of a statutory pattern designed to become effective whenever collective bargaining results in an "impasse and stalemate" likely to cause interruption of the supply of an "essential public utility service," Wis. Stat., 1949, § 111.50, that service including water, heat, gas, electric power, public passenger transportation and communications. *Id.*, § 111.51. Whenever such an "impasse" occurs, the Wisconsin Employment Relations Board is empowered to appoint a conciliator to meet with the parties in an effort to settle the dispute. *Id.*, § 111.54. In the event of a failure of conciliation, the Board is directed to select arbitrators who shall "hear and determine" the dispute. *Id.*, § 111.55. The act establishes standards to govern the decision of the arbitrators, *id.*, §§ 111.57–111.58, and provides that the order of the arbitrators shall be final and binding upon the parties, *id.*, § 111.59, subject to judicial review, *id.*, § 111.60. In summary, the act substitutes arbitration upon order of the Board for collective bargaining whenever an impasse is reached in the bargaining process. And, to insure conformity with the statutory scheme, Wisconsin denies to utility employees the right to strike.

In upholding the constitutionality of the Public Utility Anti-Strike Act, the Wisconsin Supreme Court stressed the importance of utility service to the public welfare and the plenary power which a state is accustomed to exercise over such enterprises. Petitioners' claim that the Wisconsin law conflicts with federal legislation enacted under the Commerce Clause of the Constitution (Art. I, § 8) was overruled, as were petitioners' contentions that the Wisconsin Act violates the Due Process Clause of the Fourteenth Amendment and the Thirteenth Amendment. Respondents controvert each of these contentions and, apart from the questions of *res judicata* discussed in No. 302, decided this day, *post*, p. 411, raise no other grounds in support of the judgments below. We deal only with

the question of conflicting federal legislation as we have found that issue dispositive of both cases.

*First.* We have recently examined the extent to which Congress has regulated peaceful strikes for higher wages in industries affecting commerce. *Automobile Workers v. O'Brien,* 339 U. S. 454 (1950). We noted that Congress, in § 7 of the National Labor Relations Act of 1935,[5] as amended by the Labor Management Relations Act of 1947,[6] expressly safeguarded for employees in such industries the "right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection," [7] "e. g., to strike." [8] We also listed the qualifications and regulations which Congress itself has imposed upon its guarantee of the right to strike,

---

[5] 49 Stat. 449, 29 U. S. C. § 151 *et seq.*

[6] 61 Stat. 136, 29 U. S. C. (Supp. III) § 141 *et seq.*

[7] Section 7 of both acts, 29 U. S. C. (Supp. III) § 157. See also §§ 2 (3) and 13, 29 U. S. C. (Supp. III) §§ 152 (3), 163; S. Rep. No. 573, 74th Cong., 1st Sess. 8–9 (1935); House Conf. Rep. No. 510, 80th Cong., 1st Sess. 38 (1947).

In the "Declaration of Policy" of the Labor Management Relations Act of 1947, Congress stated:

"It is the purpose and policy of this Act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce . . . ." 29 U. S. C. (Supp. III) § 141 (b).

The "Findings and Policies" of the National Labor Relations Act provides, *inter alia:*

"It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 49 Stat. 449, 29 U. S. C. (Supp. III) § 151.

[8] H. R. Rep. No. 245, 80th Cong., 1st Sess. 26 (1947).

including requirements that notice be given prior to any strike upon termination of a contract,[9] prohibitions on strikes for certain objectives declared unlawful by Congress,[10] and special procedures for certain strikes which might create national emergencies.[11] Upon review of these federal legislative provisions, we held, 339 U. S. at 457:

> "None of these sections can be read as permitting concurrent state regulation of peaceful strikes for higher wages. Congress occupied this field and closed it to state regulation. *Plankinton Packing Co.* v. *Wisconsin Board,* 338 U. S. 953 (1950); *La Crosse Telephone Corp.* v. *Wisconsin Board,* 336 U. S. 18 (1949); *Bethlehem Steel Co.* v. *New York Labor Board,* 330 U. S. 767 (1947); *Hill* v. *Florida,* 325 U. S. 538 (1945)." [12]

---

[9] Section 8 (d) of the 1947 Act, 29 U. S. C. (Supp. III) § 158 (d). Petitioners in both cases had complied with all notice requirements before strike action was taken.

[10] Section 8 (b) (4) of the 1947 Act, 29 U. S. C. (Supp. III) § 158 (b) (4). See also §§ 10 (j) and 10 (l), 29 U. S. C. (Supp. III) §§ 160 (j), 160 (l), empowering and directing the N. L. R. B. to obtain injunctive relief against such unlawful strikes.

[11] Sections 206–210 of the 1947 Act, 29 U. S. C. (Supp. III) §§ 176–180.

[12] Our decision in *O'Brien, supra,* followed shortly after our reversal, *per curiam,* in *Plankinton Packing Co., supra,* where the Wisconsin Employment Relations Board had, with the approval of the State Supreme Court, ordered reinstatement of an employee discharged because of his failure to join a union, even though his employment was not covered by a union shop or similar contract. Section 7 of the Labor Management Relations Act not only guarantees the right of self-organization and the right to strike, but also guarantees to individual employees the "right to refrain from any or all of such activities," at least in the absence of a union shop or similar contractual arrangement applicable to the individual. Since the N. L. R. B. was given jurisdiction to enforce the rights of the employees, it was clear that the Federal Act had occupied this field to the

*Second.* The Wisconsin court sought to distinguish *Automobile Workers* v. *O'Brien, supra,* on the ground that the industry to which Michigan applied its notice and strike-vote provisions was a national manufacturing organization rather than a local public utility. Congress drew no such distinction but, instead, saw fit to regulate labor relations to the full extent of its constitutional power under the Commerce Clause, *Labor Board* v. *Fainblatt,* 306 U. S. 601, 607 (1939). Ever since the question was fully argued and decided in *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197 (1938), it has been clear that federal labor legislation, encompassing as it does all industries "affecting commerce," applies to a privately owned public utility whose business and activities are carried on wholly within a single state. The courts of appeal have uniformly held enterprises similar to and no more important to interstate commerce than the Milwaukee gas and transit companies before us in these cases subject to the provisions of the federal labor law.[13]  No

exclusion of state regulation. *Plankinton* and *O'Brien* both show that states may not regulate in respect to rights guaranteed by Congress in § 7.

[13] *E. g., Labor Board* v. *Baltimore Transit Co.,* 140 F. 2d 51, 53–54 (C. A. 4th Cir., 1944) (local transit company) ; *Pueblo Gas & Fuel Co.* v. *Labor Board,* 118 F. 2d 304, 305–306 (C. A. 10th Cir., 1941) (local gas company) ; *Labor Board* v. *Western Massachusetts Electric Co.,* 120 F. 2d 455, 456–457 (C. A. 1st Cir., 1941) ; *Labor Board* v. *Gulf Public Service Co.,* 116 F. 2d 852, 854 (C. A. 5th Cir., 1941) ; *Consumers Power Co.* v. *Labor Board,* 113 F. 2d 38, 39–41 (C. A. 6th Cir., 1940) ; *Southern Colorado Power Co.* v. *Labor Board,* 111 F. 2d 539, 541–543 (C. A. 10th Cir., 1940) (local power companies). See also *Virginia Elec. & Power Co.* v. *Labor Board,* 115 F. 2d 414, 415–416 (C. A. 4th Cir., 1940), upheld on the question of jurisdiction in *Labor Board* v. *Virginia Elec. & Power Co.,* 314 U. S. 469, 476 (1941).

The question of the applicability of the federal labor laws to local utilities is rarely litigated today. The Milwaukee Gas Light Com-

distinction between public utilities and national manufacturing organizations has been drawn in the administration of the Federal Act,[14] and, when separate treatment for public utilities was urged upon Congress in 1947, the suggested differentiation was expressly rejected.[15]  Cre-

pany, employer in No. 438, conceded before the N. L. R. B. that it is engaged in commerce within the meaning of the Federal Act. 50 N. L. R. B. 809, 810 (1943).

In 1947, it was proposed that the coverage of the Federal Act be limited so as to exclude utilities and other enterprises whose productive effort did not extend across state lines. H. R. 1095, 80th Cong., 1st Sess., § 2 (b).  Congress did not adopt any such limitation on the application of the National Labor Relations Act, but, instead, amended that Act with full appreciation of the extent of its coverage.  See H. R. Rep. No. 245, 80th Cong., 1st Sess. 40, 44 (1947); S. Rep. No. 105, 80th Cong., 1st Sess. 26 (1947); H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 60 (1947).

[14] The N. L. R. B. has specifically rejected the suggestion that in granting the right to strike or in the other provisions of the Federal Act Congress intended that there be any distinction between public utility employees and those otherwise employed.  *El Paso Electric Co.*, 13 N. L. R. B. 213, 240 (1939), enforced in *El Paso Electric Co. v. Labor Board*, 119 F. 2d 581 (C. A. 5th Cir., 1941).

In a recent statement of policy, the N. L. R. B. declared that, in view of the "important impact on commerce," jurisdiction will be exercised in "all cases" involving the type of public utilities before us in these cases.  *Local Transit Lines*, 91 N. L. R. B. 623, 26 LRR Man. 1547 (1950).

[15] 93 Cong. Rec. 3835 (1947), statement of Senator Taft, quoted in note 21, *infra.*  The Case Bill, H. R. 4908, 79th Cong., 2d Sess. (1946), passed by both Houses of Congress during the session immediately preceding the enactment of the Labor Management Relations Act of 1947, proposed special techniques, including a temporary denial of the right to strike, in connection with "labor dispute[s] affecting commerce, involving a public utility whose rates are fixed by some governmental agency." § 6 (a).  In his veto message, the President criticized the special treatment accorded to public utilities, 92 Cong. Rec. 6674, 6676, (1946).  Congress did not override the veto and, while such special treatment for public utilities was again proposed in 1947, note 16, *infra*, no such distinction is found in the 1947 legislation as finally enacted by Congress.

ation of a special classification for public utilities is for Congress, not for this Court.

*Third.* As we have noted, in 1947 Congress enacted special procedures to deal with strikes which might create national emergencies.[16] Respondents rely upon that action as showing a congressional intent to carve out a separate field of "emergency" labor disputes and, pointing to the fact that Congress acted only in respect to "national emergencies," respondents ask us to hold that Congress intended, by silence, to leave the states free to regulate "local emergency" disputes. However, the Wisconsin Act before us is not "emergency" legislation but a comprehensive code for the settlement of labor disputes between public-utility employers and employees.[17] Far from being limited to "local emergencies," the

---

[16] Sections 206–210 of the 1947 Act, 29 U. S. C. (Supp. III) §§ 176–180. These so-called national emergency provisions call for the appointment of a board of inquiry to report the facts of the dispute, followed by a vote of the employees on whether to strike. An injunction to maintain the status quo for a limited period pending the exhaustion of these remedies is authorized by the Act.

The House version of the Labor Management Relations Act of 1947, H. R. 3020, 80th Cong., 1st Sess., contained a broader provision calling for a temporary prohibition on strikes whenever interstate commerce in an essential public service was threatened, during which time an advisory settlement board would recommend specific terms for settlement. A similar plan was proposed on a temporary basis in H. R. 2861, 80th Cong., 1st Sess., and approved by H. R. Rep. No. 235, 80th Cong., 1st Sess. (1947). This plan was rejected in favor of the Senate version which permitted a temporary injunction against strikes only when the "national health or safety" was imperiled and then only while a board of inquiry sifted the facts without making recommendations. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 63–64 (1947).

[17] The Wisconsin Act applies generally to "labor disputes between public utility employers and their employes which cause or threaten to cause an interruption in the supply of an essential public utility service." Wis. Stat., 1949, § 111.50.

act has been applied to disputes national in scope,[18] and application of the act does not require the existence of an "emergency."[19]  In any event, congressional imposition of certain restrictions on petitioners' right to strike, far from supporting the Wisconsin Act, shows that Congress has closed to state regulation the field of peaceful strikes in industries affecting commerce. *Automobile Workers* v. *O'Brien, supra,* at 457.  And where, as here, the state seeks to deny entirely a federally guaranteed right which Congress itself restricted only to a limited extent in case of national emergencies, however serious, it is manifest that the state legislation is in conflict with federal law.

Like the majority strike-vote provision considered in *O'Brien,* a proposal that the right to strike be denied, together with the substitution of compulsory arbitration in cases of "public emergencies," local or national, was before Congress in 1947.[20]  This proposal, closely resembling the pattern of the Wisconsin Act, was rejected by Congress as being inconsistent with its policy in respect

---

[18] *Communications Workers of America, C. I. O., Div. 23,* and *Wisconsin Telephone Co.,* Wis. E. R. B. Decision No. 2358–C (1950), (arbitrators appointed to determine the Wisconsin phase of the national telephone strike threatened in the spring of 1950).

[19] Far from being legislation aimed at "emergencies," the Wisconsin Act has been invoked to avert a threatened strike of clerical workers of a utility. *Wisconsin Telephone Clerical Union* and *Wisconsin Telephone Co.,* Wis. E. R. B. Case No. 2273 PU–9 (1949).  See *Wisconsin Telephone Co.* v. *Wisconsin E. R. B.,* 253 Wis. 584, 34 N. W. 2d 844 (1948), where the Wisconsin Supreme Court refused to set aside the Board order appointing a conciliator in the same proceeding on the ground that the order was not appealable.

[20] H. R. 17; H. R. 34; H. R. 68; H. R. 75; H. R. 76, all of the 80th Cong., 1st Sess.  In addition to granting federal authority to ban strikes under certain circumstances, § 6 (a) of each act would have permitted the operation of state anti-strike legislation.  This

to enterprises covered by the Federal Act, and not because of any desire to leave the states free to adopt it.[21]  Michigan, in *O'Brien,* sought to impose conditions on the right to strike and now Wisconsin seeks to abrogate that right

legislative proposal is discussed by Representative Case in 93 Cong. Rec. A1007–A1009 (1947).

See also the other proposals before the same Session of Congress to deny the right to strike in specified instances.  H. R. 90 and H. R. 1095, both of the 80th Cong., 1st Sess.

[21] The reasoning behind the congressional rejection of any proposals similar to the Wisconsin Act was stated by Senator Taft as follows, 93 Cong. Rec. 3835–3836 (1947):

"Basically, I believe that the committee feels, almost unanimously, that the solution of our labor problems must rest on a free economy and on free collective bargaining.  The bill is certainly based upon that proposition.  That means that we recognize freedom to strike when the question involved is the improvement of wages, hours, and working conditions, when a contract has expired and neither side is bound by a contract.  We recognize that right in spite of the inconvenience, and in some cases perhaps danger, to the people of the United States which may result from the exercise of such right.  In the long run, I do not believe that that right will be abused.  In the past few disputes finally reached the point where there was a direct threat to and defiance of the rights of the people of the United States.

"We have considered the question whether the right to strike can be modified.  I think it can be modified in cases which do not involve the basic question of wages, prices, and working conditions.  But if we impose compulsory arbitration, or if we give the Government power to fix wages at which men must work for another year or for two years to come, I do not see how in the end we can escape a collective economy.  If we give the Government power to fix wages, I do not see how we can take from the Government the power to fix prices; and if the Government fixes wages and prices, we soon reach the point where all industry is under Government control, and finally there is a complete socialization of our economy.

"I feel very strongly that so far as possible we should avoid any system which attempts to give to the Government this power finally to fix the wages of any man.  Can we do so constitutionally?  Can we say to all the people of the United States, 'You must work at wages fixed by the Government'?  I think it is a long step from free-

altogether insofar as petitioners are concerned.[22]  Such
state legislation must yield as conflicting with the exercise
of federally protected labor rights.

---

dom and a long step from a free economy to give the Government
such a right.

"It is suggested that we might do so in the case of public utilities;
and I suppose the argument is stronger there, because we fix the
rates of public utilities, and we might, I suppose,. fix the wages of
public-utility workers.  Yet we have hesitated to embark even on
that course, because if we once begin a process of the Government
fixing wages, it must end in more and more wage fixing and finally
Government price fixing.  It may be a popular thing to do.  Today
people seem to think that all that it is necessary to do is to forbid
strikes, fix wages, and compel men to continue working, without
consideration of the human and constitutional problems involved in
that process.

"If we begin with public utilities, it will be said that coal and steel
are just as important as public utilities.  I do not know where we
could draw the line.  So far as the bill is concerned, we have pro-
ceeded on the theory that there is a right to strike and that labor peace
must be based on free collective bargaining.  We have done nothing
to outlaw strikes for basic wages, hours, and working conditions
after proper opportunity for mediation.

.          .          .          .          .

"We did not feel that we should put into the law, as a part of the
collective-bargaining machinery, an ultimate resort to compulsory
arbitration, or to seizure, or to any other action.  We feel that it
would interfere with the whole process of collective bargaining.  If
such a remedy is available as a routine remedy, there will always be
pressure to resort to it by whichever party thinks it will receive
better treatment through such a process than it would receive in
collective bargaining, and it will back out of collective bargaining.
It will not make a bona-fide attempt to settle if it thinks it will
receive a better deal under the final arbitration which may be
provided."

See also S. Rep. No. 105, 80th Cong., 1st Sess. 13–14, 28 (1947).

[22] Congress demonstrated its ability to deny in express terms the
right to strike when it so desired.  See § 305 of the 1947 Act, 29
U. S. C. (Supp. III) § 188, making it unlawful for employees of the
United States or its agencies to participate in any strike.

*Fourth.* Much of the argument generated by these cases has been considerably broader than the legal questions presented.

The utility companies, the State of Wisconsin and other states as *amici* stress the importance of gas and transit service to the local community and urge that predominantly local problems are best left to local governmental authority for solution. On the other hand, petitioners and the National Labor Relations Board, as *amicus,* argue that prohibition of strikes with reliance upon compulsory arbitration for ultimate solution of labor disputes destroys the free collective bargaining declared by Congress to be the bulwark of the national labor policy. This, it is said, leads to more labor unrest and disruption of service than is now experienced under a system of free collective bargaining accompanied by the right to strike. The very nature of the debatable policy questions raised by these contentions convinces us that they cannot properly be resolved by the Court. In our view, these questions are for legislative determination and have been resolved by Congress adversely to respondents.

When it amended the Federal Act in 1947, Congress was not only cognizant of the policy questions that have been argued before us in these cases, but it was also well aware of the problems in balancing state-federal relationships which its 1935 legislation had raised. The legislative history of the 1947 Act refers to the decision of this Court in *Bethlehem Steel Co.* v. *New York Labor Board,* 330 U. S. 767 (1947), and, in its handling of the problems presented by that case, Congress demonstrated that it knew how to cede jurisdiction to the states.[23] Congress

---

[23] Section 10 (a) of the 1947 Act, 29 U. S. C. (Supp. III) § 160 (a). A proviso of § 10 (a) authorizes cession of jurisdiction to the states only where the state law is consistent with the federal legislation. This insures that the national labor policy will not be thwarted even

knew full well that its labor legislation "preempts the field that the act covers insofar as commerce within the meaning of the act is concerned" [24] and demonstrated its ability to spell out with particularity those areas in which it desired state regulation to be operative.[25]   This Court, in the exercise of its judicial function, must take the comprehensive and valid federal legislation as enacted and declare invalid state regulation which impinges on that legislation.

*Fifth.*  It would be sufficient to state that the Wisconsin Act, in forbidding peaceful strikes for higher wages in industries covered by the Federal Act, has forbidden the exercise of rights protected by § 7 of the Federal Act.   In addition, it is not difficult to visualize situations in which application of the Wisconsin Act would work at cross-purposes with other policies of the National Act.   But we content ourselves with citation of examples of direct conflict found in the records before us.   In the case of the transit workers, the union agreed to continue collective bargaining after the strike became imminent, whereas the company insisted upon invocation of the compulsory arbitration features of the Wisconsin Act.   That act requires that collective bargaining continue until an "impasse" is reached, Wis. Stat., 1949, § 111.52, whereas the Federal

---

in the predominantly local enterprises to which the proviso applies. S. Rep. No. 105, 80th Cong., 1st Sess. 26 (1947).   See also minority views to same report, *id.*, pt. 2, 38, agreeing as to this feature of the legislation.

[24] H. R. Rep. No. 245, 80th Cong., 1st Sess. 44 (1947).

[25] See §§ 8 (d), 14 (b), 202 (c) and 203 (b), 29 U. S. C. (Supp. III) §§ 158 (d), 164 (b), 172 (c), and 173 (b), in addition to § 10 (a) of the 1947 Act for examples of congressional direction as to the role that states were to play in the area of labor regulation covered by the Federal Act.   And §§ 2 (2) and 2 (3) of the Federal Act, 29 U. S. C. (Supp. III) §§ 152 (2), 152 (3), specifically exclude from its operation the employees of "any State or political subdivision thereof."

Act requires that both employer and employees continue to bargain collectively,[26] even though a strike may actually be in progress. *Labor Board* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333, 345 (1938). Further, the transit company was able to avoid entirely any determination of certain union demands when the arbitrators, in accordance with Wis. Stat., 1949, § 111.58, ruled that the matter of assigning of workers to certain shifts "infringe[s] upon the right of the employer to manage his business." Yet similar problems of work scheduling and shift assignment have been held to be appropriate subjects for collective bargaining under the Federal Act as administered by the National Labor Relations Board. See *Woodside Cotton Mills Co.*, 21 N. L. R. B. 42, 54–55 (1940); *American National Ins. Co.*, 89 N. L. R. B. 185 (1950), and cases cited therein.

The National Labor Relations Act of 1935 and the Labor Management Relations Act of 1947, passed by Congress pursuant to its powers under the Commerce Clause, are the supreme law of the land under Art. VI of the Constitution. Having found that the Wisconsin Public Utility Anti-Strike Law conflicts with that federal legislation, the judgments enforcing the Wisconsin Act cannot stand.

*Reversed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON and MR. JUSTICE MINTON join, dissenting.

Wisconsin has provided that labor disputes in public utilities shall be resolved by conciliation or compulsory arbitration if:

(1) after exerting "every reasonable effort to settle labor disputes" by collective bargaining, the parties have reached a "state of impasse and stalemate," and

---

[26] §§ 8 (a) (5) and 8 (b) (3); 29 U. S. C. (Supp. III) §§ 158 (a) (5), 158 (b) (3).

(2) the labor dispute, if not settled, is "likely to cause interruption of the supply of an essential public utility service." Wis. Stat., 1949, §§ 111.50–111.65.[1]

---

[1] Section 111.50 states the policy of the statute in the following terms:

"It is hereby declared to be the public policy of this state that it is necessary and essential in the public interest to facilitate the prompt, peaceful and just settlement of labor disputes between public utility employers and their employes which cause or threaten to cause an interruption in the supply of an essential public utility service to the citizens of this state and to that end to encourage the making and maintaining of agreements concerning wages, hours and other conditions of employment through collective bargaining between public utility employers and their employes, and to provide settlement procedures for labor disputes between public utility employers and their employes in cases where the collective bargaining process has reached an impasse and stalemate and as a result thereof the parties are unable to effect such settlement and which labor disputes, if not settled, are likely to cause interruption of the supply of an essential public utility service. The interruption of public utility service results in damage and injury to the public wholly apart from the effect upon the parties immediately concerned and creates an emergency justifying action which adequately protects the general welfare."

"Public utility employer" is defined as any employer "engaged in the business of furnishing water, light, heat, gas, electric power, public passenger transportation or communication . . . ." § 111.51.

Section 111.52 imposes a duty on employers and employees to bargain collectively. If collective bargaining fails, the statute provides for a conciliation procedure. § 111.54. If the conciliator is unable to effect a settlement within 15 days, the dispute is submitted to arbitration. § 111.55. Existing wages, hours, and conditions of employment are to be maintained during conciliation and arbitration. § 111.56.

Standards for the arbitrator are set forth in the statute, § 111.57, and he is forbidden to make an award which "would infringe upon the right of the employer to manage his business" or "would interfere with the internal affairs of the union." § 111.58. The arbitrator's award becomes binding on the parties "together with such agreements as the parties may themselves have reached." § 111.59. It may be

In the cases before us, the statute has been applied to prevent a halt in service by two utility companies.[2] One furnishes heating and illuminating gas to the general public in the City and County of Milwaukee. The other provides bus and streetcar transportation in the same area. Both these companies give utility service only within the State of Wisconsin but have been found subject to the Taft-Hartley Act because their activities "affect commerce." Compare *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197; *La Crosse Telephone Corp.* v. *Wisconsin Board,* 336 U. S. 18. The question is whether the Wisconsin statute, so applied, conflicts with the Taft-

---

changed by "mutual consent or agreement of the parties," § 111.59, and is subject to judicial review. § 111.60.

The statute makes it unlawful for any group of public-utility employees "acting in concert" to call a strike or go out on strike or cause a work stoppage or slowdown which would cause an interruption of an essential service. The statute also makes it unlawful for a public utility employer to lock out his employees if such action would cause an interruption of essential service. § 111.62. Such unlawful action on the part of either employer or employees may be enjoined in an action instituted by the State Board. § 111.63. Section 111.64 makes clear that only a concerted refusal to work is made unlawful, and provides that no court shall issue process "to compel an individual employe to render labor or service or to remain at his place of employment without his consent."

[2] The situation before us involves solely the interruption in essential services of a public utility. Any attempt by Wisconsin to apply its arbitral scheme to a labor dispute that does not clearly involve such an essential utility operation is not now in issue. This makes it unnecessary for us to consider whether the Wisconsin law might be constitutionally applied to a strike of clerical employees such as that involved in *Wisconsin Telephone Co.* v. *Wisconsin Board,* 253 Wis. 584, 34 N. W. 2d 844. In that case the Wisconsin Court did not uphold application of the statute to the particular dispute. It held only that the State Board's action in appointing a conciliator was a preliminary order and hence, under principles of administrative law, not reviewable.

Hartley Act, 61 Stat. 136, 29 U. S. C. (Supp. III) §§ 141 *et seq.*

A claim of conflict between State and federal labor legislation presents a familiar problem. On eight occasions this Court has considered whether the Taft-Hartley Act, or its predecessor, the Wagner Act, 49 Stat. 449, so collided with State law as to displace it. We have sustained State laws which dealt with mass picketing and intermittent work stoppages. *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740; *International Union, United Automobile Workers* v. *Wisconsin Board,* 336 U. S. 245. We have also upheld a State law which required a two-thirds vote for a maintenance-of-membership clause in collective agreements. *Algoma Plywood Co.* v. *Wisconsin Board,* 336 U. S. 301.

On the other hand, we have found in five cases that the State law could not consistently stand with the federal law. In *Hill* v. *Florida,* 325 U. S. 538, the State was found to have interfered with the freedom in selecting bargaining agents as guaranteed by the federal act. In *Bethlehem Steel Co.* v. *New York Board,* 330 U. S. 767, the State recognized a foremen's union contrary to established policy of the National Board. In *La Crosse Telephone Corp.* v. *Wisconsin Board, supra,* a conflict was found in the bargaining units determined under the State and federal acts. In *Plankinton Packing Co.* v. *Wisconsin Board,* 338 U. S. 953, a State superimposed upon federal outlawry of conduct as an "unfair labor practice" its own finding of unfairness. In *International Union of United Automobile Workers* v. *O'Brien,* 339 U. S. 454, a State act covering all industry permitted strikes at a different time than the federal act and required, unlike federal law, a majority authorization for any strike. Also, these provisions were applied to only that portion of a bargaining unit, already determined under the federal act, located within the State of Michigan.

"The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" Chief Justice Hughes in *Kelly* v. *Washington,* 302 U. S. 1, 10. It is clear from the decisions just canvassed that the States are not precluded from enacting laws on labor relations merely because Congress has—to use the conventional phrase—entered the field. It is equally clear that the boundaries within which a State may act are determined by the terrain and not by abstract projection. Emphasis in the opinions has varied, but the guiding principle is still that set out in the first in the series of immediately relevant cases: whether "the state system of regulation, as construed and applied here, can be reconciled with the federal Act and . . . the two as focused in this case can consistently stand together . . . ." *Allen-Bradley Local* v. *Wisconsin Board, supra,* at 751. The adjustment thus called for between State and National interests is not attained by reliance on uncritical generalities or rhetorical phrases unnourished by the particularities of specific situations.

At the outset it should be noted that the Taft-Hartley Act does not, in specific terms, deal with the problem of local strikes in public utilities even though such strikes, as a matter of constitutional law, may be brought under federal control. Congress considered and rejected special provision for settling public-utility disputes under federal law. See statement of Senator Taft, 93 Cong. Rec. 3835. So far as the statute and its legislative history indicate, however, Congress decided no more than that it did not wish to subject local utilities to the control of the Federal Government. Due regard for basic elements in our federal system makes it appropriate that Congress be explicit if it desires to remove from the orbit of State regulation

matters of such intimate concern to a locality as the continued maintenance of services on which the decent life of a modern community rests.

The real issue before the Court is whether the Wisconsin legislation so conflicts with the specific terms or the policy fairly attributable to the provisions of the federal statute that the two cannot stand together. We are first met with the provisions of the Taft-Hartley Act concerning the "right" to strike. Section 7 provides: "Employees shall have the right . . . to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, . . . ." Section 13 provides: "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." The word "right" is "one of the most deceptive of pitfalls." Mr. Justice Holmes, in *American Bank & Trust Co.* v. *Federal Bank,* 256 U. S. 350, 358. We have several times rejected an invitation to decide cases upon the basis of an absolute right to strike. In *International Union, United Automobile Workers* v. *Wisconsin Board, supra,* we found there was no "right" to strike in violation of a State law construed to prohibit intermittent work stoppages. In *Southern Steamship Co.* v. *Labor Board,* 316 U. S. 31, we found there was no "right" to strike in violation of a federal mutiny statute. In two other cases we held that employees who strike in violation of a collective agreement or engage in "sit-down" strikes are not protected under the federal statute. *Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332; *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240. May the "right" to strike be also limited by an otherwise valid State statute aimed at preventing a breakdown of public-utility service?

"Public utility employer" is defined in the Wisconsin Act to mean an employer "engaged in the business of

furnishing water, light, heat, gas, electric power, public passenger transportation or communication . . . ." § 111.51. Labor relations in such utilities have traditionally been subjected to regulation in a way that those in other industries have not. See *Wilson* v. *New,* 243 U. S. 332, 349. Compare Conspiracy, and Protection of Property Act, 38 & 39 Vict., c. 86, par. 4 (1875). The range of control over business generally has been greatly extended by modern law. But the historic amenability to legal control of public callings is rooted deep. See *Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522, 543. A stoppage in utility service so clearly involves the needs of a community as to evoke instinctively the power of government. This Court should not ignore history and economic facts in construing federal legislation that comes within the area of interacting State and federal control. To derive from the general language of the federal act a "right" to strike in violation of a State law regulating public utilities is to strip from words the limits inherent in their context.

An attempt by a State to impose upon industry as a whole a drastic limitation upon the right to strike would conflict with the federal law. Compare *United Automobile Workers* v. *O'Brien, supra.* And even as to emergency disputes—those involving the obvious public services—it may be urged that the prospect of settlement by arbitration may tend to make one or both parties reluctant to reach an agreement by bargaining. See Kennedy, The Handling of Emergency Disputes, Proceedings of Second Annual Meeting of Industrial Relations Research Assn. 14, 21–22 (1949).

But the principle of hands-off collective bargaining is no more absolute than the right to strike. The "national emergency" provisions in the Taft-Hartley Act are an affirmative indication that the force of collective bargain-

ing may be limited in emergency situations. Title II of the Taft-Hartley Act provides for special mediation procedures, a cooling-off period, and ballot by employees on the final offer of the employer, in order to prevent a strike or lockout in "an entire industry or a substantial part thereof" if necessary to avoid peril to "the national health or safety." § 206. And Congress apparently expected that additional laws would be enacted if necessary.[3] The "national emergency" provisions were aimed at strikes of nation-wide significance. They have been applied in eight disputes from 1947 to 1950: twice in industry-wide or coast-wide maritime negotiations; three times in industry-wide bituminous-coal negotiations; and in disputes arising in the meat-packing industry, the national telephone industry, and the atomic-energy installation at Oak Ridge. U. S. Dept. of Labor, Bureau of Labor Statistics, Federal Fact-Finding Boards and Boards of Inquiry (1950) 2.

Title II would be available for settlement of the disputes involved in the cases before us only if they were a part of a nation-wide utility dispute creating a national emergency.[4] But the careful consideration given to the prob-

---

[3] See S. Rep. No. 105, 80th Cong., 1st Sess. 15: "In most instances the force of public opinion should make itself sufficiently felt in [the] 80-day period [during which the strike is enjoined] to bring about a peaceful termination of the controversy. Should this expectation fail, the bill provides for the President laying the matter before Congress for whatever legislation seems necessary to preserve the health and safety of the Nation in the crisis." The reference is to § 210 of the Taft-Hartley Act, which provides that if the injunction is discharged, "the President shall submit to the Congress a full and comprehensive report of the proceedings, including the findings of the board of inquiry and the ballot taken by the National Labor Relations Board, together with such recommendations as he may see fit to make for consideration and appropriate action."

[4] It is clear that the national emergency provisions were not meant to cover local strikes such as those involved in the cases now before

lem of meeting nation-wide emergencies and the failure to provide for emergencies other than those affecting the Nation as a whole do not imply paralysis of State police power. Rather, they imply that the States retain the power to protect the public interest in emergencies economically and practically confined within a State. It is not reasonable to impute to Congress the desire to leave States helpless in meeting local situations when Congress restricted national intervention to national emergencies.

Only one other of the petitioners' arguments raises a substantial question of conflict.[5] Section 111.58 of the

---

us. See S. Rep. No. 105, 80th Cong., 1st Sess. 14: "While the committee is of the opinion that in most labor disputes the role of the Federal Government should be limited to mediation, we recognize that the repercussions from stoppages in certain industries are occasionally so grave that the national health and safety is imperiled. An example is the recent coal strike in which defiance of the President by the United Mine Workers Union compelled the Attorney General to resort to injunctive relief in the courts. The committee believes that only in national emergencies of this character should the Federal Government be armed with such power."

There might of course be a conflict if the Wisconsin Act were held applicable by her courts to a threatened strike which was only a part of a nation-wide utility dispute to which the provisions of Title II had been applied. But our task is to decide the case before us and not to conjure up difficulties that may never arise. See *Allen-Bradley Local* v. *Wisconsin Board*, 315 U. S. 740, 746.

The Wisconsin statute is not in conflict with the provisions of Title II of the Taft-Hartley Act creating a mediation and conciliation service. The federal act takes account of state mediation facilities, and the federal officials are directed "to avoid attempting to mediate disputes which would have only a minor effect on interstate commerce if State or other conciliation services are available to the parties." § 203 (b).

[5] A further argument is based upon § 111.56 of the Wisconsin Act which requires that the *status quo* as to terms of employment be maintained during conciliation and arbitration. The Taft-Hartley Act requires the parties to continue terms of an existing contract for only 60 days after notice of termination has been given or until the

Wisconsin Act prohibits the arbitrator from making an award "which would infringe upon the right of the employer to manage his business." In No. 330, *post,* p. 416, the Wisconsin court affirmed the Board's order refusing to make an award dealing with the composition of shifts. It is argued that this construction of the Wisconsin statute brings it in conflict with the Board position that parties must bargain on such an issue. See *American National Insurance Co.,* 89 N. L. R. B. 185; *Woodside Cotton Mills,* 21 N. L. R. B. 42, 54–55. The term in the Wisconsin statute deals not with the scope of bargaining, but with the power of an arbitrator to make an award after bargaining has failed. The State law does nothing

---

expiration date of the contract, whichever is later. § 8 (d) (4). The additional restriction of the Wisconsin Act is imposed in order to assure the effectiveness of the arbitration system and presents no problem of conflict in administration of the two statutes. The only objections to the *status quo* provisions are the arguments against the incompatibility of the federal act and any system of compulsory arbitration. These have been discussed in the text.

Two additional arguments are based upon hypothetical conflicts not raised by the present cases. Section 111.52 of the Wisconsin Act requires that the parties "exert every reasonable effort" in order to settle the labor dispute. It is claimed that this language may be construed to require the parties to make concessions during the bargaining process—something which § 8 (d) of the Taft-Hartley Act says they do not have to do. The second argument is that, from § 111.57 of the Wisconsin Act, it appears that arbitration might be required where negotiations were underway to amend an existing contract. Under § 8 (d) of the Taft-Hartley Act, there is no duty to bargain concerning amendment of a contract still in effect. It is a sufficient answer to these contentions to note the broad separability provision in § 111.65 of the Wisconsin Act, and repeat what we said in *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740, 746: "We deal . . . not with the theoretical disputes but with concrete and specific issues raised by actual cases. . . . Nor will we assume in advance that a State will so construe its law as to bring it into conflict with the federal Constitution or an act of Congress."

to relieve the employer of his duty to bargain under the federal act, nor is there any indication that the duty to bargain under the State act differs from that under the federal act.

Whether the State chose wisely in adopting arbitration rather than taking no measure or taking a more forceful measure to protect the public interest is not for us to decide. Seizure or martial law or other affirmative action by the State might be just as deleterious to collective bargaining as enforced arbitration, apart from raising other contentious issues. If there is legislative choice it is not for us to demand that what is chosen should commend itself to our private notions of wise policy. As to strikes creating a nation-wide emergency, the provisions of the Taft-Hartley Act indicate that the principle of collective bargaining may to some extent be subordinated to the interest of the public. I find no indication in the statute that the States are not equally free to protect the public interest in State emergencies.

The claim that the Wisconsin statute violates the Due Process Clause of the Fourteenth Amendment was for me definitively answered thirty years ago by Mr. Justice Brandeis:

"Because I have come to the conclusion that both the common law of a State and a statute of the United States [the Clayton Act] declare the right of industrial combatants to push their struggle to the limits of the justification of self-interest, I do not wish to be understood as attaching any constitutional or moral sanction to that right. All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not

for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat." *Duplex Co.* v. *Deering,* 254 U. S. 443, 488 (dissenting).