**UNITED TRANSPORTATION
UNION, Appellee,**

v.

**LONG ISLAND RAIL ROAD COMPANY
and Metropolitan Transportation Authority of New York, Appellants.**

**No. 1120, Docket 80–7199.**

United States Court of Appeals,
Second Circuit.

Argued April 18, 1980.

Decided Sept. 15, 1980.

Edward D. Friedman, Washington, D. C. (Harold A. Ross, Cleveland, Ohio, Sidney Fox, New York City, Highsaw, Mahoney & Friedman, P. C., Washington, D. C., Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City, Ross & Kraushaar, Cleveland, Ohio, Sanchez & McKay, Congers, N.Y., of counsel), for appellee.

Eugene P. Souther, New York City (Anthony R. Mansfield, Todd M. Brinberg, Michael W. Kelly, Sheri A. Van Greenby, Seward & Kissel, New York City, Thomas M. Taranto, Jamaica, N. Y., of counsel), for appellants.

Ronald M. Etter, Acting Gen. Counsel, National Mediation Bd., Washington, D. C., filed brief for the U. S. as amicus curiae.

Before MULLIGAN, Circuit Judge, and SPEARS * and SWEET,** District Judges.

SWEET, District Judge.

This appeal presents the question of whether employees of the Long Island Rail Road Company (the "LIRR") are subject to the provision in New York's Taylor Law, N.Y.Civ.Serv.Law §§ 200–214 (the "Taylor Law"), prohibiting strikes by public employees,[1] or the provision in the Railway Labor Act, 45 U.S.C. §§ 151 et seq. (the "RLA"), allowing for such self help.[2] Resolution of this question presents the difficult and vexing task of determining the line which separates state and federal power in the penumbra where both state and federal legislation have been enacted. Since in this case we conclude that the RLA impairs the State's ability to structure employer–employee relationships in its role as sole provider of an essential public service, the rationale of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) requires that we reverse the decision of the district court.

I

The LIRR is a rail common carrier serving five counties within the metropolitan New York City area. It was acquired by New York State in 1966 through the agency now known as the Metropolitan Transportation Authority (the "MTA"), which continues to have day–to–day responsibility for the operation of the LIRR.

The LIRR carries approximately 250,000 passengers each week day and is the only common carrier by rail serving the public and industries in Nassau and Suffolk Counties. While its physical operations are solely within New York State, it interchanges freight with more than a dozen interstate rail carriers and handles from 800–1000 freight cars per week. Its revenue from freight operations in 1979 was in excess of $12.1 million. These freight revenues have decreased steadily over the years and now

---

\* United States District Judge for the Western District of Texas, sitting by designation.

\*\* United States District Judge for the Southern District of New York, sitting by designation.

1. N.Y.Civ.Serv.Law § 210(1) provides:

   No public employee or employee organization shall engage in a strike, and no public employee or employee organization shall cause, instigate, encourage or condone a strike.

2. Although not explicitly set forth in the RLA, the parties may resort to self–help once the RLA's procedures designed to induce agreement have been exhausted. *See Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 380, 89 S.Ct. 1109, 1116, 22 L.Ed.2d 344 (1969).

provide a fraction of its total income, which is estimated at more than $300 million.

The appellee United Transportation Union (the "UTU") is one of seven collective bargaining representatives for the LIRR operating and train employees. On December 7, 1979, as the parties were on the verge of exhausting the collective bargaining procedures provided by the Railway Labor Act, the UTU filed this suit in the Eastern District of New York seeking (1) a declaratory judgment that the relationship between the parties was governed by the RLA and that the employees could thus not be subjected to the sanctions of the Taylor Law in the event they engaged in self help; and (2) injunctive relief to protect those rights of the employees guaranteed by the Act, including an injunction against the commencement or prosecution of a state court action seeking to invoke the Taylor Law.

The next day, the unions, including the UTU, went on strike. On December 14, 1979, a Presidential Emergency Board was established pursuant to § 10 of the RLA, 45 U.S.C. § 160, and the employees returned to work.[3]

Appellants moved to dismiss this action but before the motion was heard, on February 8, 1980, converted the LIRR from a private stock corporation to a public benefit corporation whose employees would be at least facially subject to the Taylor Law. On February 12, the UTU responded by moving for a temporary restraining order and preliminary injunctive relief restraining the defendants from commencing a state court action pursuant to the Taylor Law to enjoin a strike by UTU members.

Following additional litigation[4] the UTU moved for summary judgment. In his opinion granting the motion, then Chief Judge Jacob Mishler found that the LIRR is a "carrier" engaged in interstate transportation and therefore subject to the Railway Labor Act. After further analysis, he concluded that the federal scheme preempts the State from regulating the labor relations of the railroad's employees, rejecting the invitation to find that such regulation improperly displaces the State's freedom to structure integral operations in areas of traditional governmental functions.[5]

The district judge then issued a permanent injunction restraining the LIRR and the MTA from taking any action in state court based on an alleged violation of the Taylor Law. The UTU was also enjoined from engaging in any "self help" pending this Court's review of the case.[6]

## II

■ Appellants argue, at the outset, that the State Attorney General is an indispensable party to this action because he is independently obligated to take the action that the UTU has sought to enjoin. Specifically, they refer to N.Y.Civ.Serv.Law § 211, which provides that the chief legal officer of the government involved shall apply to the supreme court for an injunction against a threatened violation of the Taylor Law.[7]

---

3. The "cooling off" period triggered by the President's action was to expire 60 days later, on February 14, 1980.

4. On February 13, the LIRR commenced a suit against the UTU and other unions in Supreme Court, New York County, seeking an injunction under the Taylor Law against the impending strike. It was represented in that action by the State Attorney General. A temporary restraining order issued in that case, and on February 14, the unions removed that action to the United States District Court for the Southern District of New York. The unions then moved to transfer and consolidate the action with the instant action pending before Judge Mishler, and the LIRR moved to remand the state action. The latter motion was granted by Chief Judge Lloyd MacMahon on February 25.

A second procedural sideshow was instituted on February 27, when the UTU moved in Supreme Court, Queens County, to transfer the state action from New York County to Queens. That motion was denied on March 3, 1980, thwarting an apparent attempt to remove the action to the Eastern District of New York.

5. *United Transp. Union v. Long Island R. R., et al.*, No. 79-3118, slip op. at n.4 (E.D.N.Y. Mar. 5, 1980).

6. The labor dispute that precipitated this action was ultimately settled on April 11, 1980.

7. N.Y.Civ.Serv.Law § 211 provides in pertinent part:

Notwithstanding the provisions of section eight hundred seven of the labor law, where

In this case the joinder of the Attorney General as a party is not necessary for the granting of complete relief, nor would the disposition of the action in his absence leave any of the parties subject to a substantial risk of incurring inconsistent obligations. Fed.R.Civ.P. 19(a).[8] To begin with, there is no authority for the proposition that the Attorney General must proceed as a plaintiff in his own name in addition to bringing the action of the aggrieved state parties. Instead, the Attorney General or other "chief legal officer" must simply act as legal representative of such agencies in Taylor Act proceedings. *See Yorktown Central School Dist. No. 2 v. Yorktown Congress of Teachers*, 42 A.D.2d 422, 348 N.Y. S.2d 367, 371 (2d Dept. 1973).

Since in this case the Attorney General did not represent appellants, it could be argued that he should have been joined as a separate, indispensable party. However, the record indicates that the Attorney General was involved in a related action in state court, *see* note 4, *supra*, and that he undoubtedly had knowledge of the instant action and could have participated therein had he chosen to do so. Moreover, in light of the fact that the MTA and LIRR, in opposing the injunction, took the same position as the Attorney General would have taken, he cannot be heard to claim that the disposition of the action in his absence impairs his ability to protect the State's interests. Fed.R.Civ.P. 19(a)(2)(i).

Finally, disposition of this action without the presence of the Attorney General would not subject any party to a substantial risk of incurring inconsistent obligations. As the district judge noted, the Attorney General would be bound by any injunction in this action of which he had actual notice under Fed.R.Civ.P. 65(d).[9] Consequently, this action need not be dismissed for failure to join as an indispensable party.

### III

We agree with the finding of the district court that the Long Island Rail Road is a "carrier" subject to the Railway Labor Act. A "carrier" includes a "carrier by railroad, subject to the Interstate Commerce Act" (the "ICA"). 45 U.S.C. § 151.[10]

---

it appears that public employees or an employee organization threaten or are about to do, or are doing, an act in violation of section two hundred ten of this article, the chief executive officer of the government involved shall (a) forthwith notify the chief legal officer of the government involved, and (b) provide such chief legal officer with such facilities, assistance and data as will enable the chief legal officer to carry out his duties under this section, and, notwithstanding the failure or refusal of the chief executive officer to act as aforesaid, the chief legal officer of the government involved shall forthwith apply to the supreme court for an injunction against such violation.

**8.** Fed.R.Civ.P. 19(a) requires joinder of a party if:

(1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

**9.** Fed.R.Civ.P. 65(d) provides in pertinent part that an order granting an injunction:

is binding only upon the parties to the action, their officers, agents, . . . and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order . . . .

**10.** Section 151 of Title 45 provides in pertinent part:

When used in this chapter and section 225 of Title 28 and for the purposes of said chapter and section—

First. The term "carrier" includes any express company, sleeping–car company, carrier by railroad, subject to the Interstate Commerce Act, . . . . *Provided, however,* That the term "carrier" shall not include any street, interurban, or suburban electric railway, unless such railway is operating as a part of a general steam–railroad system of transportation, but shall not exclude any part of the general steam–railroad system of transportation now or hereafter operated by any other motive power. The Interstate Commerce Commission is authorized and directed upon request of the Mediation Board or upon complaint of any party interested to determine after hearing whether any line operated by electric power falls within the terms of this proviso. . . .

Such carriers must be involved in transportation outside a single state, 49 U.S.C. § 10501(2),[11] and do not include a street, interurban or suburban electric railway, unless such railway is operating as part of a general steam–railroad system of transportation. 45 U.S.C. § 151.

Appellants do not seriously dispute that the LIRR is subject to the literal terms of the Railway Labor Act. As the district court noted, the LIRR's freight service provides a crucial physical link with other interstate rail carriers in the movement of interstate rail freight via New York. Moreover, the LIRR historically has considered itself a "carrier" within the meaning of the RLA, as demonstrated by the facts that its has consistently filed reports required by the ICA and that its employees have received the benefits of the Railroad Retirement Act, the Railroad Unemployment Insurance Act and the Federal Employees Liability Act.[12]

Appellants argue instead that Congress did not intend that the RLA apply to an essentially local commuter transportation system such as the LIRR simply because it does a limited amount of freight business. They note in this regard that Congress specifically excluded from RLA coverage certain types of local transportation systems that existed at the time of its enactment such as "suburban electric railways" and "street electric railways." 45 U.S.C. § 151.

While it is argued that Congress also would have created an exclusion for the LIRR if it could have foreseen how the railroad would evolve, we decline to legislate such an exception. Apart from a general reluctance to undertake such a task, we note that it is not clear what Congress would have done in this instance. The LIRR's freight business, while declining and less significant than its passenger business, still generates over $12 million in revenues derived from business in interstate commerce. Although this constitutes but a fraction of the revenues of the LIRR, its impact on interstate commerce is of some significance and consequently, any change in the regulation of this type of rail carrier must be left to Congress.

## IV

If the LIRR were a privately owned carrier, the commerce clause regulation would prevail, and no further analysis would be required. The LIRR is a wholly owned subsidiary of a state agency, however, and appellants urge that even if the LIRR is subject to the literal terms of the RLA, that Act may not be enforced so as to allow a strike because it interferes with an integral state function, namely, the State's ability to structure employer–employee relationships in public commuter transportation.

Appellants have relied on *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), in which the Supreme Court struck down the application of the Fair Labor Standards Act's minimum wage and maximum hour provisions to state employees. In *National League of Cities*, the Supreme Court broke

11. Section 10501 of Title 49 provides:
    (a) Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation–
    (1) by rail carrier, express carrier, sleeping car carrier, water common carrier, and pipeline carrier that is–
    (A) only by railroad; . . .
    (2) to the extent the transportation is in the United States and is between a place in–
    (A) a State and a place in another State;
    . . .
    (b) The Commission does not have jurisdiction under subsection (a) of this section over–
    (1) the transportation of passengers or property, or the receipt, delivery, storage, or handling of property, entirely in a State (other than the District of Columbia) and not transported between a place in the United States and a place in a foreign country except as otherwise provided in this subtitle.

12. In addition, in a recent decision dealing with another subsidiary of the MTA, the Interstate Commerce Commission noted that the LIRR is a carrier subject to the Railway Labor Act. *Bhd. of Locomotive Engineers v. Staten Island Rapid Transit Operating Auth.*, Finance Docket No. 29011 (Nov. 8, 1979). Since the LIRR was not a party to that dispute the opinion of the ICC is not conclusive, but it does have some persuasive value.

with precedent in finding that Congress may not exercise its power over interstate commerce "to force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made." 426 U.S. at 855, 96 S.Ct. at 2476. Although it did not fully define the meaning of "integral" or "traditional" state governmental functions, the plurality opinion indicated that they would include typically, fire prevention, police protection, sanitation, public health and parks. Id. at 851, 96 S.Ct. at 2474.

In a short but "pivotal" concurring opinion,[13] Mr. Justice Blackmun stated that he joined the plurality with the understanding that the Court had adopted a balancing approach under which federal regulation will be upheld if the federal interest is "demonstrably greater" than the State's. 426 U.S. at 856, 96 S.Ct. at 2476. While some commentators argue that the plurality actually rejected any weighing of federal and state concerns,[14] many lower courts have found a balancing approach to be implicit in that opinion. See, e. g., Virginia Surface Mining & Reclamation Ass'n v. Andrus, 483 F.Supp. 425, 435 (W.D. Va. 1980); Remmick v. Barnes County, 435 F.Supp. 914, 915 (D.N.D. 1977); State of Colo. v. Veterans' Adm., 430 F.Supp. 551, 559 (D.Colo. 1977), aff'd on other grounds, 602 F.2d 926 (10th Cir. 1979), cert. denied, 444 U.S. 1014, 100 S.Ct. 663, 62 L.Ed.2d 643 (1980); Usery v. Edward J. Meyer Memorial Hosp., 428 F.Supp. 1368, 1370 (W.D.N.Y. 1977). See also State of Tenn. v. Louisville & N.R. Co., 478 F.Supp. 199, 206 (M.D. Tenn. 1979).

Even if the plurality did not adopt such a balancing approach, Justice Blackmun's test remains of crucial importance, for without his concurrence the federal regulation in National League of Cities would have been upheld. Accordingly, in cases since Nation-al League of Cities several circuits, including this one, have examined the federal interest in regulating the area in addition to determining whether the activity qualifies as an integral governmental function. See Halderman v. Pennhurst State School & Hospital, 612 F.2d 84, 99 n.21 (3rd Cir. 1979) (en banc), cert. granted in part, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980); Peel v. Florida Dept. of Transp., 600 F.2d 1070, 1083 (5th Cir. 1979); In re Special April 1977 Grand Jury, 581 F.2d 589, 592 (7th Cir.) (per curiam), cert. denied sub nom. Scott v. United States, 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978); United States v. Best, 573 F.2d 1095, 1102 (9th Cir. 1978); Friends of the Earth v. Carey, 552 F.2d 25, 37–38 (2d Cir.), cert. denied, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977).

The inquiry is therefore essentially two-tiered. To determine whether MTA's operation of the LIRR falls within the sphere of protected state activity, we must first consider whether the operation of the railroad qualifies as an integral or traditional government function. If it does, the federal interest in regulating the collective bargaining relations of LIRR employees under the Railway Labor Act must be weighed against the State's interest in applying the Taylor Law.

A. Integral Government Function

In National League of Cities v. Usery, the plurality attached various labels to the activities it sought to protect, referring to "functions essential to separate and independent existence," 426 U.S. at 845, 96 S.Ct. at 2471, "integral governmental functions," id. at 851, 96 S.Ct. at 2474, and "traditional governmental functions." Id. at 852, 96 S.Ct. at 2474. The tenor of the opinion, however, is that the States must retain the power to make certain choices and decisions in connection with their role as provider of

---

13. State Dep't of Transp. v. United States, 430 F.Supp. 823, 825 (N.D. Ga. 1976).

14. See Matsumoto, National League of cities—From Footnote to Holding–State Immunity from Commerce Clause Regulation, 1977 Ariz. St.L.J. 35, 71 n.193; Tushnet, Constitutional and Statutory Analyses in the Law of Federal Jurisdiction, 25 U.C.L.A. L.Rev. 1301, 1338, 1340 (1978). But see Horowitz, The Autonomy of the Univ. of California under the State Constitution, 25 U.C.L.A. L.Rev. 23, 33 (1977) (balancing approach in plurality opinion).

certain public services.[15] The making of these choices and structuring of operations will be termed "essential governmental decisions." 426 U.S. at 850, 96 S.Ct. at 2473. The types of public services that are singled out for protection will be called "integral governmental functions." *Id.* at 855, 96 S.Ct. at 2475.[16]

There is no question but that, as in *National League of Cities*, the operation of the federal statute directly displaces that State's ability to structure its employee-employer relationships and to make essential governmental decisions. *See* 426 U.S. at 851, 96 S.Ct. at 2474. In enacting the Taylor Law, New York State made a determination that in order to protect the public it must assure the orderly and uninterrupted operations and functions of government by prohibiting strikes by public employees. N.Y.Civ.Serv. Law § 200.[17] Enactment of the Taylor Act was prompted in large part by the transit strike which crippled New York City in 1966.[18] By precluding the State from enforcing this legislation, including its no–strike provision, the Railway Labor Act eliminates a key provision in the State's legislative effort to provide its citizens with continuous public transportation. This was graphically illustrated by the LIRR's week long walk–out in December and its two–day strike at the time of the recent strike by New York City bus and subway workers. Moreover, the freedom to strike affects the collective bargaining process and could result in requiring the State to pay higher wages in order to avert the devastating economic injury that a halt in the commuter transportation system would cause.[19] Thus the inability to prohibit public employee strikes and its possible economic effect deprives the States of the right to make the "fundamental employment decisions" that are essential to their "separate and independent existence." *Id.* at 851, 96 S.Ct. at 2474.

Having found that the RLA operates to displace "essential governmental decisions," it is next necessary to determine whether

---

**15.** In this regard, the term "sovereignty" as used in the opinion has been defined to mean "the state's role of providing for the interests of its citizens in receiving important social services." Michelman, *States' Rights and States' Roles: Permutations of Sovereignty in* National League of Cities v. Usery, 86 Yale L.J. 1165, 1172 (1977). *See* Tribe, *Unraveling* National League of Cities: *The New Federalism and Affirmative Rights to Essential Government Services,* 90 Harv.L.Rev. 1065, 1074, 1076–77 n.42 (1977).

**16.** The plurality used the term "integral" in at least five places in *National League of Cities,* 426 U.S. at 851, 852, 854 n.18, 855, 96 S.Ct. at 2474, 2475 (twice). At one point the plurality states that the "challenged amendments operate to directly displace the State's freedom to structure 'integral operations' in areas of traditional government functions." *Id.* at 852, 96 S.Ct. at 2474. At other places, the phrase "integral" appears to have roughly the same meaning as "traditional." Michelman, *supra,* at 1172. While the phrase "integral government services" rather than "integral governmental function" might better indicate the focus on the public service provided, for the sake of consistency we choose to use the Supreme Court's phrase.

**17.** N.Y.Civ.Serv. Law § 200 provides:
The legislature of the state of New York declares that it is the public policy of the state and the purpose of this act to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government. These policies are best effectuated by (a) granting to public employees the right of organization and representation, (b) requiring the state, local governments and other political subdivisions to negotiate with, and enter into written agreements with employee organizations representing public employees which have been certified or recognized, (c) encouraging such public employers and such employee organizations to agree upon procedures for resolving disputes, (d) creating a public employment relations board to assist in resolving disputes between public employees and public employers, and (e) continuing the prohibition against strikes by public employees and providing remedies for violations of such prohibition.

**18.** New York Times, January 16, 1966, at 1 col. 1.

**19.** The 11–day transit strike in April cost New York City an estimated $1.1 billion, and businesses lost an estimated $100 million daily. Cirrillo, *New Yorkers Ride Again,* Associated Press, April 12, 1980.

those decisions affect the operations of "integral governmental functions." In this regard, it seems beyond question that the LIRR is an important public service. That the State's operation of the LIRR therefore qualifies as a protected state activity, however, is not as readily resolved.

In *United States v. California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936), the Supreme Court found that provisions of the Federal Safety Act were applicable to the State Belt Railroad, notwithstanding the fact that the railroad was owned by the State of California. Forty years later, in *National League of Cities v. Usery, supra,* the Court again addressed the subject of a state–owned railroad, stating in dictum:

> The holding of *United States v. California* . . . is quite consistent with our holding today. There California's activity to which the congressional command was directed was not in an area that the States have regarded as integral parts of their governmental activities. It was, on the contrary, the operation of a railroad engaged in "common carriage by rail in interstate commerce . . . ." 297 U.S., at 182, 56 S.Ct. at 423.

*National League of Cities v. Usery,* 426 U.S. at 854, n.18, 96 S.Ct. at 2475. Mr. Justice Brennan noted in his *National League of Cities* dissent that, although the plurality distinguished *United States v. California,* its logic would overrule the earlier decision. 426 U.S. at 871, 96 S.Ct. at 2483. Commentators also have questioned the rationality of excluding railroads from the protected core of governmental functions, particularly the closer these railroads come to resembling commuter lines. *See, e. g.,* Michelman, *States' Rights and States' Roles: Permutations of "Sovereignty" in* National League of Cities v. Usery, 86 Yale L.J. 1165, 1172 n.28 (1977).

We find that *United States v. California* does not dictate the result here. The plurality's definition of state sovereignty in *National League of Cities* suggests that "the terms 'traditional' or 'integral' are to be given a meaning permitting expansion to meet changing times." *Amersbach v. City of Cleveland,* 598 F.2d 1033, 1037 (6th Cir. 1979). Obviously, the catalog of essential state–provided services is not and cannot be static. As Mr. Justice Douglas observed in *New York v. United States,* 326 U.S. 572, 591, 66 S.Ct. 310, 318, 90 L.Ed. 326 (1946) (Douglas J., dissenting), "[w]hat might have been viewed in an earlier day as an improvident or even dangerous extension of state activities may today be deemed indispensable."

In view of the foregoing, *United States v. California* is distinguishable from the case at bar. The State Belt Railroad, although operated intrastate as a "public function and without profit," was solely a freight service, the proceeds from which were used for harbor improvements. 297 U.S. at 183, 56 S.Ct. at 424. The LIRR, on the other hand, as a provider of passenger transportation in a metropolitan area, furnishes a very important public service which has come to be supplied primarily by state and local governments.[20]

Aside from the fact that local passenger transportation is now of necessity provided almost exclusively by state and local governments, the service is essential to the public and inures to its benefit much more directly than did that provided by the California Belt Railroad. Without the LIRR, commuters would find it difficult or impossible to get to their jobs, and the reduced influx of people into New York City would have a significant impact upon the economy of the city and the State.[21] The absence of passenger rail service to and from Long Island would have a severe environmental

---

**20.** Consider, for example, the Chicago Transit Authority, Massachusetts Transit Authority, San Francisco's Bay Area Rapid Transit. In addition, Miami is constructing a system that will connect the city with the suburbs, New

York Times, Mar. 9, 1978, at 18 Col. 1, and Atlanta has opened portions of its new rapid transit system. New York Times, July 1, 1979, at 16, col. 1.

**21.** See note 18, *supra.*

impact.[22] Moreover, we cannot be blind to the sweep of world wide events which by all indications is forcing substantial alteration of our former profligate transportation practices and undeniably will create reliance on public mass transit.

In sum, there are two grounds for finding the State's operation of a passenger rail service, as distinguished from a freight service, to be an "integral governmental function." First, it is a service that the state and local governments are particularly suited to provide because of the community–wide need–and it is a service they have come to provide by a process of economic elimination of private suppliers. *See Amersbach v. City of Cleveland*, 598 F.2d at 1037. Although this is a relatively new development, there now is no reasoned basis for finding that the operation of an intrastate passenger service which transports tens of thousands to and from their jobs every day is any less a governmental function than are sanitation or public parks and recreation. *See National League of Cities v. Usery*, 426 U.S. at 851, 96 S.Ct. at 2474.

Second, there is little doubt that the LIRR's passenger service is of much more importance to the public, in several respects, than was the state–operated freight line in *United States v. California, supra.*

There is some question, however, as to the current validity of focusing on the importance of a public service when defining what constitutes an "integral governmental function." Historically, the Supreme Court has recognized that the range of arguably essential public services that could be provided by local government is potentially limitless, and has thus shied away from "public function" analysis. *See, e. g., Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352–53, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974) (rejecting "essential public service" test for determining what constitutes state action).[23] *See generally Amalgamated Ass'n of Street, Elec. Railway & Motor Coach Employees v. Wisconsin Employment Relations Bd.*, 340 U.S. 383, 397–98, 71 S.Ct. 359, 367, 95 L.Ed. 364 (1951) (public importance of gas and transit service to community irrelevant in light of congressional intent to permit strikes under NLRA).

More recently, in *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court again declined the opportunity to engage in "public service" analysis. In holding that municipalities are not automatically exempt from federal antitrust laws, the plurality avoided an "integral function" test altogether. Instead of focusing on the type of service involved–a municipally owned electric utility–the plurality stated that the city's anticompetitive practices would be immune from antitrust regulation only if authorized or contemplated by a legislative mandate from the State. *Id.* at 415, 98 S.Ct. at 1138.

In a concurring opinion, Chief Justice Burger relied on the fact that the utility was a proprietary enterprise, noting that

---

**22.** For example William J. Ronan, then Chairman of the New York State Metropolitan Commuter Transit Authority, testified during the Senate hearings in 1970 that "if the Long Island Railroad went out of existence tomorrow, it would take a minimum number of 26 lanes of expressway from Long Island in one direction, and 26 coming out of the city, to handle the traffic currently handled by the Long Island Railroad." *Effect of Railroad Mergers on Commuter Transportation: Hearings before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking and Currency*, 90th Cong., 2d Sess. 1138 (hereinafter "Hearings"). He added that ten blocks in the center of New York City would have to be set aside solely for parking. *Id.*

**23.** In *Jackson v Metropolitan Edison Co., supra*, the Court also rejected an "affected with the public interest" analysis, quoting from *Nebbia v. New York*, 291 U.S. 502, 536, 54 S.Ct. 505, 506, 78 L.Ed. 940 (1934):

It is clear that there is no closed class or category of businesses affected with a public interest, .... The phrase "affected with a public interest" can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions "affected with a public interest," and "clothed with a public use," have been brought forward as the criteria ... it has been admitted that they are not susceptible of definition and form an unsatisfactory test ....

the operation of a business enterprise is not "an integral operation in the area of traditional government functions." 435 U.S. at 423–24, 98 S.Ct. at 1142. He stressed that *National League of Cities'* definition of sovereignty is whether the State's interest involved "functions essential to separate and independent existence," *id.* at 423, 98 S.Ct. at 1142, and indicated that the state–owned railroad in *United States v. California* did not meet that definition even though it was operated "without profit, and as a 'public function.'" *Id.* at 422 n. 4, 98 S.Ct. at 1142 n. 4.

The impact of *Lafayette* on *National League of Cities* must be considered.[24] We believe that *Lafayette* may be limited to its antitrust context; indeed, the plurality noted a "presumption against implied exclusions from coverage of the antitrust laws." 435 U.S. at 399, 98 S.Ct. at 1129.[25] Moreover, while *Lafayette* involved an enterprise which is undoubtedly as important a public service as the operation of a local passenger railroad line, both the plurality and Chief Justice Burger's concurring opinions noted that the City of Lafayette competed with private utilities for customers in the area. *See* 435 U.S. at 391 n. 3, 403–08, 422 n. 3, 98 S.Ct. at 1125, 1131–1134, 1141. Indeed, Chief Justice Burger stated that he used "the term 'proprietary' only to focus attention on the fact that all of the parties are in a competitive relationship such that each should be constrained, when necessary, by the federal antitrust laws." 435 U.S. at 422 n. 3, 98 S.Ct. at 1141 n. 3. The exist-

ence of competition demonstrates that the public was not completely dependent on the municipality for the service and that it was economically feasible for private entities to provide it.

In contrast, had the MTA not taken over the operations of the LIRR in 1966, there probably would be no LIRR today. The substantial state and local funds used to subsidize the railroad attest to the fact that no private businessman would dare undertake the venture.[26] In short, not only is that particular activity essential to the public, but it is also essential that the government step in to furnish it.[27] *See Amersbach v. City of Cleveland*, 598 F.2d at 1037–38 ("[e]xperience has demonstrated that airports must be maintained by municipal corporations or other units of government").

Finally, the consistency of the result in *Lafayette* with the conclusion we reach herein is further buttressed by the historical/empirical concept of state sovereignty implied in *National League of Cities* and alluded to above. In the words of one commentator, "As the problems faced by urban governments evolve, so will the citizenry's expectations of what are appropriate governmental services. Just as hospitals went from being accountable under federal regulations to a status of immunity, electric utilities may someday, in certain regions, provide an integral governmental function." Comment, National League of Cities *and the Parker Doctrine: The Status of State Sovereignty Under the Commerce*

---

**24.** See *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. at 430, 98 S.Ct. at 1146. (Stewart, J., dissenting) ("The plurality does not advance any basis for its disregard of National League of Cities . . . ."); Comment, National League of Cities *and the* Parker *Doctrine: The Status of State Sovereignty under the Commerce Clause*, 8 Fordham Urb.L.J. 301 (1980).

**25.** The Sixth Circuit, in considering the applicability of the Fair Labor Standards Act to city employees assigned to duties at the municipally owned airport paid little attention to *Lafayette*. *Amershbach v. Cleveland*, 598 F.2d at 1036–38. The Third Circuit, however, in *Halderman v. Pennhurst State School & Hosp.*, 612 F.2d 84, 99 n. 21 (1979), noted that the "*Lafayette* Court paid scant attention to *National League of Cities*, thus suggesting that even under the

commerce clause federal statutes may be enforced against the states."

**26.** The federal government has also poured large amounts of money into the improvement of the LIRR (app. at 8 and 410). This fact does not affect the state immunity determination, however, as demonstrated by the fact that schools, hospitals and law enforcement all receive federal aid, but are considered integral state governmental functions. *See* 426 U.S. at 878, 96 S.Ct. at 2486.

**27.** New York State's purchase of the LIRR was premised on its finding that private enterprise would be unable to continue to own and operate the facility. *Hearings, supra,* at 134.

*Clause*, 8 Fordham Urb.L.J. 301, 332 (1980) (footnotes omitted) Stated differently, we conclude that essentiality is gauged not only in terms of the nature of a public service, but also its availability in the marketplace.

## B. *Federal vs. State Interests*

This fluid concept of sovereignty contains the potential for devastating impact, and accordingly, has engendered some criticism. *E. g.*, Michelman, *supra*, 86 Yale L.J. at 1193; Schwartz, National League of Cities v. Usery—*The Commerce Power and State Sovereignty Redivivus*, 46 Fordham L.Rev. 1115, 1134 (1977–78). However, fears that *National League of Cities* will spur a new era of separatism are dispelled somewhat by adherence to Justice Blackmun's balancing approach, which suggests that a "demonstrably greater" federal interest should override a state's claim to immunity even in an area found to involve an integral government function. 426 U.S. at 856, 96 S.Ct. at 2476.

■ This court has stated that:

[i]n determining whether an otherwise valid exercise of the federal commerce power would impermissibly impair state sovereignty we [are] required to balance the reason for the exercise against the extent of usurpation of state policymaking or invasion of integral state functions that would result, giving "appropriate recognition to the legitimate concerns of each government." (citation omitted)

*Friends of the Earth v. Carey*, 552 F.2d at 37. In this case, it is not possible to say that after weighing the usurpation of state policy—making and the invasion of integral state functions against the reason for the exercise of the federal commerce power, the federal interest is "demonstrably greater."

First, the objectives of the RLA are consistent with those of the Taylor Law: to provide an orderly method of dispute resolution and to ensure continuous service.[28] Congress stated the purpose of the RLA under section 2 as follows:

(1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self—organization to carry out the purposes of this [Act]; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a. Avoiding interruption of commerce was deemed a "primary purpose" of the RLA by the Court in *California v. Taylor*, 353 U.S. 553, 566, 77 S.Ct. 1037, 1044, 1 L.Ed.2d 1034 (1957).

The Taylor Law's prohibition against strikes seeks to further that purpose, thereby helping the LIRR to maintain its status as a "vital link" in the flow of interstate commerce. Moreover, while the state law preempted in *California v. Taylor* was the "antithesis" of the federal scheme, since it placed an absolute prohibition on the railroad employees' right to bargain collectively, *id.* at 559–60, 77 S.Ct. at 1040–1041, the state law involved here preserves the right of independent collective bargaining in several respects. *See SIRTOA v. International Bhd. of Electrical Workers*, 57 A.D.2d 614, 393 N.Y.S.2d 773, 775–76 (2d Dept.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977).

Second, from a purely practical viewpoint, the State has a far greater interest in dispute resolution relating to the LIRR than does the federal government. While the federal government has the prevailing interest in the operation of the LIRR's freight service, the State and its municipalities have a vital, predominant interest in the continuous operation of its commuter—

---

**28.** *See* note 17, *supra*.

passenger service. In this case, the revenue from the purely intrastate passenger service was over 80% of the total revenue, and the number of trains allocated to that service was significantly greater than the number of cars on the freight line.

In sum, we recognize that the LIRR would come under the literal terms of the RLA, see *California v. Taylor, supra,* and that the right to strike, free from state interference, has been held essential to that federal scheme, *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378–82, 89 S.Ct. 1109, 1115–1117, 22 L.Ed.2d 344 (1969). In the present context, however, the federal interest in preserving the right of LIRR employees is not "demonstrably greater" than New York State's interest in preventing LIRR strikes in order to ensure continuous passenger service for so many daily commuters. We reach this result with the realization that the determination of whether state or federal interests are paramount may be difficult to resolve in future cases. However, that difficulty cannot preclude a conclusion required by the present circumstances and authorities.

Again, we are, as we must be, guided by *National League of Cities'* ground–breaking holding that:

> States as States stand on a quite different footing from an individual or a corporation when challenging the exercise of Congress' power to regulate commerce.... Congress may not exercise that power so as to force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made. 426 U.S. at 854–55, 96 S.Ct. at 2475.

Since the rationale of *National League of Cities* requires reversal here, it is not necessary to determine whether the district court improperly enjoined the LIRR and MTA from prosecuting the state court action.