**In re Frank B. NATALE and Anna Natale, h/w, Debtors.**

**Frank B. NATALE and Anna Natale, h/w, Plaintiff,**

v.

**KIRK MORTGAGE COMPANY, Homemaker Loan Consumer Discount Co., Philadelphia Policy and Fire Credit Union, G. E. C. C., Household Finance, Master Charge (Provident National Bank), Evergreen Account (Provident National Bank), Spiegel, Inc. and Trustee, Defendants.**

**Bankruptcy No. 80–00553G.
Adversary No. 80–0113G.**

United States Bankruptcy Court,
E. D. Pennsylvania.

Aug. 12, 1980.

Nicholas J. Scafidi, Fell, Spalding, Goff & Rubin, Philadelphia, Pa., for Philadelphia Police Fire Federal Credit Union.

S. Jerry Weissman, Philadelphia, Pa., for debtors.

Daniel J. Allan, Philadelphia, Pa., for Re/Max Eastern, Inc.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issues before the court are: (1) whether a judgment note together with a promissory note, a consumer credit disclosure form and a statement of income, constituted a security agreement which created a security interest in the real property of the debtors and (2) whether the actions of the debtors in attempting to prevent the creditor from enforcing its lien on the real property amounted to such fraud as to prevent the avoidance of that lien by the debt-

ors. We conclude that the documents signed by the debtors when they obtained the loan from the creditor did not constitute a security agreement and that the lien which the creditor had by virtue of a confession of judgment against the debtors was a judicial lien, not a security interest. We further conclude that the actions of the debtors did not amount to fraud and, therefore, that the debtors may avoid the creditor's judicial lien pursuant to section 522(f)(1) of the Bankruptcy Code ("the Code").

The facts of the instant case are as follows.[1] On April 13, 1977, Frank B. and Anna Natale ("the debtors") borrowed $13,-500 from the Philadelphia Police and Fire Federal Credit Union ("the Credit Union"). At that time the debtors signed (1) a judgment note, (2) a promissory note, (3) a consumer credit disclosure form and (4) a statement of income in excess of $10,000. Upon receipt of those signed documents, the Credit Union filed the promissory note (which also authorized it to confess judgment on the note against the debtors) and the statement of income in excess of $10,-000, with the prothonotary of Philadelphia County who thereupon issued a D.S.B.[2]

Some time thereafter the debtors defaulted on the loan whereupon the Credit Union brought suit against them in January, 1979, in the Court of Common Pleas of Philadelphia County.[3] After receiving service of the Credit Union's complaint, the debtors wrote to the Credit Union indicating their intent to repay the entire loan and promising to sell their home in order to do so. Although the Credit Union had a default judgment entered against the debtors on

July 30, 1979, it agreed to refrain from executing on that judgment in order to allow the debtors a reasonable time within which to sell their home and repay the loan.

On October 18, 1979, the Credit Union notified the debtors that it would no longer delay execution proceedings because it did not believe that the debtors were proceeding expeditiously with the sale of their home. The debtors then retained counsel who filed a petition on their behalf to open the Credit Union's judgment and obtained a court order staying all proceedings on that judgment until the debtors' petition was decided. On January 23, 1980, the Court of Common Pleas denied the debtors' petition to open the judgment.

On February 1, 1980, the debtors entered into an agreement of sale for their home for the sum of $45,000, subject to the payment of the first mortgage to Kirk Mortgage Company of approximately $20,000. On March 18, 1980, the debtors filed a joint petition for relief under Chapter 7 of the Code. In that petition the debtors each claimed an exemption of $7,500 in their home pursuant to Section 522 of the Code.[4] On that same day the debtors filed a complaint requesting that the property be abandoned so that it could be conveyed by the debtors in accordance with their agreement of sale. At the hearing held on the complaint, while the Credit Union did not object to the sale, it protested the proposed distribution of the proceeds of the property, contending that its lien should be paid prior to the exemption of the debtors because its interest was not avoidable, as the debtors asserted, pursuant to Section 522(f)(1).[5] In

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

2. D.S.B. is the abbreviation for "debet sine breve" signifying a debt without suit or a debt evidenced by a confession of judgment.

3. The Credit Union did so because, although it had a judgment by confession against the debtors, under Pennsylvania law it could not execute on that judgment until it had filed an action, given notice and proceeded to judgment in that action. Pa.Stat.Ann. Tit. 41, § 407 (Pur-

don Cum.Supp. 180–81). Once judgment was entered in that action, however, that judgment merged with the prior confessed judgment. *Id.*

4. Section 522(d)(1) allows a debtor to exempt up to $7,500 of his interest in any real property. Section 522(m) allows *each* debtor in a joint case to take such an exemption.

5. Section 522(f)(1) provides:

(f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to

light of that objection, we entered an order directing that the property be sold, that the first mortgage be paid in full (there being no dispute about its validity), and that the balance of the proceeds be held in escrow pending a decision by us on the avoidability of the Credit Union's interest in the debtors' property.[6]

1. The Nature of the Credit Union's Interest in the Real Property of the Debtors.

Under Section 522(f)(1) a debtor may avoid a judicial lien to the extent that it impairs an exemption that he has taken.[7] In the instant case the parties agree that the lien of the Credit Union on the debtors' real property which was created by the entry of the default judgment on July 30, 1979, was a judicial lien and may, therefore, be avoided.

■ However, the Credit Union argues that it has a second lien on the property—a security interest in the debtors' home— which is evidenced by the documents that the debtors signed at the time of obtaining the loan and by the D.S.B. issued by the prothonotary. On a close examination of the documents in question, though, we cannot agree with the Credit Union's assertion that those documents, individually or collectively, constitute an agreement granting the Credit Union a security interest in the debtors' home. To be such an agreement, the documents would have to clearly evi-

dence an intent by the parties to create a security interest in the property by the signing of those papers.[8] In the instant case, the consumer credit disclosure form does state that the loan is secured by a separate security agreement on the debtors' real property, but that form does not itself constitute such an agreement (because, among other things, it does not describe what real property is to secure the loan). Furthermore, none of the other documents have any language even suggesting an intent to create thereby a security interest in the debtors' home. In fact, the only agreement contained in the documents signed by the debtors was that the Credit Union would have the authority to confess judgment immediately against the debtors, which it did by filing the promissory note and statement of income and having the prothonotary issue the D.S.B.[9]

The Credit Union argues, however, that the lien which arose by the confession of judgment and issuance of the D.S.B. was not a judicial lien but a security interest. It contends that this is so because the parties agreed that the lien should be created. The Credit Union points to the definitions of security interest and judicial lien in the Code in support of its assertion that a security interest is a lien created by agreement of the parties while a judicial lien is a lien created by involuntary judicial process.[10]

which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(1) a judicial lien.
11 U.S.C. § 522(f)(1) (1979).

**6.** There is presently in escrow the sum of $23,-933.30. We have this day approved a stipulation filed July 30, 1980, authorizing the payment of $2,700 to the realtor as commission for the sale of the property. Therefore, there will remain $21,233.30. The debtors have claimed their exemption of $15,000 under Sec. 522(d)(1) of the Code, while the Credit Union claims approximately $17,000 (which includes interest and attorneys fees) as the amount due on its loan. Since there is not enough to pay both the debtors and the Credit Union in full from the remaining funds, the issue presented is who is entitled to the first priority in those funds.

**7.** 11 U.S.C. § 522(f)(1) (1979). *See* note 5 *supra.*

**8.** *Cf. In re Bollinger Corp.,* 614 F.2d 924 (3d Cir. 1980), in which the United States Court of Appeals for the Third Circuit discussed the requirements for a U.C.C. security agreement under Pennsylvania Law.

While the U.C.C. does not have a provision for a security interest in real property (see § 9–104(j)), under the Code such a security interest is recognized. *See* Legislative History & Comments to 11 U.S.C. § 101(36) & (37) (1979).

**9.** *See* note 2 *supra.*

**10.** The Credit Union also cites 5 Collier on Bankruptcy ¶¶ 1300.109 & 1300.120 (15th ed. 1980) for the proposition that a security interest is a voluntary, consensual lien while a judicial lien is an involuntary lien.

458

We cannot agree that this interpretation of the Code. While it is true that under the Code a security interest is a lien created by agreement of the parties, a judicial lien is defined as a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding." [11] We interpret that definition to include liens created by "voluntary" judicial process as well as by "involuntary" judicial process.

In the instant case no lien arose merely by the agreement of the parties (since, as we found above, the documents signed by the debtors did not constitute a security agreement). The lien in question arose by virtue of the action of the Credit Union in filing the promissory note and the statement of income and the action of the prothonotary in issuing the D.S.B. This was judicial process and the fact that the parties agreed that this should be done did not change its nature.

Therefore, since the documents which the debtors signed did not create a security interest in their home and since the lien which arose by the issuance of the D.S.B. was a judicial lien and not a security interest, we conclude that the lien which the Credit Union had on the home of the debtors was a judicial lien and could be avoided by the debtors pursuant to Section 522(f)(1) to the extent that it impaired their real property exemption.

2. The Nature of the Actions of the Debtor in Delaying the Creditor's Attempts to Enforce Its Lien.

The Credit Union further argues that the actions of the debtors in delaying its attempts to enforce its lien on the real property amounted to fraud and, therefore, would prevent the debtors from avoiding the Credit Union's lien. We do not agree.

Initially, we do not find from the evidence that the debtors committed any fraudulent acts. Frank Natale testified that he hired an attorney to delay the execution threatened by the Credit Union in order to give himself enough time to sell his home and repay the loan to the Credit Union. There is no evidence of an intent by him to defraud the Credit Union. Further, he testified that he did not know or understand what actions his attorney undertook for him. Therefore, even if we were to find that the actions of the debtors' attorney were fraudulent (which we cannot find on the basis of the sparse record before us), there is no evidence that the debtors authorized or intended such actions. Consequently, we cannot conclude that the debtors committed any fraudulent acts with respect to the Credit Union.

Therefore, we conclude that the lien of the Credit Union in the real property of the debtors may be avoided to the extent that it impairs their exemption. Thus, of the funds held in escrow, the debtors are entitled to the first $15,000, free of the Credit Union's lien, while the remainder, approximately $6,233.30, shall go to the Credit Union on account of its lien.