**In re Frank GALBRAITH and Maria Galbraith, His Wife, Debtors.**

**Bankruptcy No. 80–00659G.**

United States Bankruptcy Court,
E. D. Pennsylvania.

Nov. 24, 1981.

Dana Breslin, Michael Donahue, Delaware County, Legal Assistance Ass'n, Chester, Pa., for debtors, Frank Galbraith and Maria Galbraith, his wife.

Jason W. Manne, Asst. Atty. Gen., Legal Counsel, Harrisburg, Pa., for Commonwealth of Pennsylvania.

Jonathan H. Ganz, Philadelphia, Pa., Trustee.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue confronting us is whether the liens acquired by the Commonwealth of Pennsylvania Department of Public Welfare ("DPW") in the real property of the debtors as welfare recipients may be avoided by them pursuant to § 522(f)(1) of the Bankruptcy Code ("the Code"). We conclude that the DPW liens are judicial liens which impair an exemption of the debtors and thus fall within the scope of § 522(f)(1). We conclude further that the Tenth Amendment to the United States Constitution and considerations of federalism do not preclude the application of § 522(f)(1) to avoid the said liens.

The facts of the case at bench are as follows:[1] On April 2, 1980, Frank and Maria Galbraith ("the debtors") filed a voluntary petition for relief under chapter 7 of the Code. Prior to that time, the debtors had received public welfare assistance from the DPW. In order to receive that assistance, the debtors were required to periodically sign a "PA–9 form" which authorized the DPW to confess judgment against the debtors. Four separate D.S.B.[2] judgments were thus obtained by the DPW against the debtors in the Court of Common Pleas of Delaware County, Pennsylvania, thereby creating liens on the debtors' residence located at 753 Windsor Circle, Folcroft, Pennsylvania.

After filing their petition for relief under the Code, the debtors filed the instant application to avoid the liens of the DPW pursuant to § 522(f)(1).[3] The DPW filed a mo-

---

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

2. D.S.B. is the abbreviation for "debet sine breve" which signifies a debt without a suit or a debt based on a confession of judgment.

3. Section 522(f)(1) provides:

tion to dismiss that application on several grounds. Firstly, the DPW asserts that its liens are not judicial liens but, rather, are either security interests or statutory liens which are not avoidable under § 522(f)(1). Secondly, the DPW argues that, even if its liens are determined to be judicial in nature, those liens are still not avoidable because they do not impair an exemption of the debtors. Thirdly, the DPW contends that to apply § 522(f)(1) to its liens would be an intrusion upon the Commonwealth's sovereignty and would, thus, contravene the mandates of the Tenth Amendment to the United States Constitution and considerations of federalism. For the following reasons, we conclude that the DPW's arguments are without merit.

## I. The Nature of the DPW's Interest in the Debtors' Real Property.

To determine whether the DPW lien is a judicial lien, a security interest or a statutory lien, we must first look to the definitions of those terms given by the Code. The Code defines a judicial lien as a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding." 11 U.S.C. § 101(27). A security interest is defined in the Code as a "lien created by agreement." 11 U.S.C. § 101(37). A statutory lien is defined as a "lien arising solely by force of a statute on specified circumstances or conditions." 11 U.S.C. § 101(38). The legislative history of the Code makes it crystal clear that the above definitions are mutually exclusive,

that is, a given lien may not fall within more than one of the above three categories.[4]

■ Pursuant to those definitions, we find that the DPW lien fits within the interpretation of a judicial lien as given by the Code. We so conclude because the DPW lien is a "judgment" by confession and clearly arises through a legal process or proceeding, that is, it arises by the action of the DPW in filing the confession of judgment and by the action of the prothonotary in issuing and docketing the D.S.B. judgment. This clearly makes that lien a "judicial lien." [5]

The DPW argues nonetheless that the legal incidents which flow from its lien are so unlike those of a judicial lien that it would be inconsistent with congressional intent to characterize the DPW's lien as a judicial lien. The DPW asserts that the usual judicial lien is a part of the debt collection process and it is that lien which Congress intended to be avoidable by a debtor. Thus, the DPW contends, its lien which is taken contemporaneously with the giving of value and which is not part of a debt collection process should not be avoidable. We disagree. Firstly, many judgments (notably confessed judgments) are taken contemporaneously with the giving of value and, therefore, the DPW's lien is not unique in that respect. Secondly, by the clear language used by Congress in § 522(f)(1), it is evident that Congress intended to allow debtors to avoid *all* judicial

(f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—
    (1) a judicial lien.
11 U.S.C. § 522(f)(1).

**4.** The legislative comment to § 101(28) of the Code states:
    In general, the concept of lien is divided into three kinds of liens: judicial liens, security interests, and statutory liens. Those three categories are *mutually exclusive* and are exhaustive except for certain common law liens.

H.R.Rep.No.95–595, 95th Cong., 1st Sess. 312 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 25 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5787, 5811. (Emphasis added.) *See also,* § 101(38) which states, in defining a statutory lien, that that term "does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute." 11 U.S.C. § 101(38).

**5.** *See, e. g., In re Griggs,* 12 B.R. 443 (Bkrtcy., E.D.Pa.1981); *In re Smith,* Bankr.No. 5–80–00081 (M.D.Pa. Dec. 10, 1980); *In re Natale,* 5 B.R. 454, 6 B.C.D. 784, 2 C.B.C.2d 875 (Bkrtcy., E.D.Pa.1980).

liens, not just judicial liens which arise as part of a debt collection process.

The DPW also asserts that its lien is unique in another respect which mandates that it receive treatment different from other judicial lienholders; that is, the Pennsylvania Statute prevents it from executing on its lien during the lifetime of the debtors or their children.[6] We disagree with the DPW's argument. Firstly, the restrictions on the DPW's ability to execute on its lien do not prevent it from enforcing that lien during the lifetime of the debtors if they should sell their home. At that point the DPW may enforce its lien as may any other lienholder. Secondly, the restrictions on the DPW do not make its lien so unique from other judicial liens as to cause us to ignore the plain language of Congress in § 522(f)(1) which permits the debtors to avoid all judicial liens.

The DPW argues, however, that even though its lien arises through a confession of judgment that lien resembles a security interest more than it does a judicial lien under the Bankruptcy Code, particularly in light of the broad definition of a security interest given by the Code. While we agree that the Code does give a broader definition of the term security interest than the Uniform Commercial Code ("U.C.C."),[7] we conclude that we must still look to the U.C.C. and state law for the elements necessary for a security interest. The United States Court of Appeals for the Third Circuit, in *In re Bollinger Corporation*, 614 F.2d 924 (3d Cir. 1980), found the requisite elements of a security interest to be: (1) a writing, (2) signed by the debtor, (3) which contains a description of the collateral, and (4) which evidences an intent of the parties to create a security interest thereby.

The DPW concedes that the PA–9 form and D.S.B. judgment obtained by it do not meet the third criteria stated above because they do not contain a description of the collateral covered thereby. However, the DPW maintains that this is not fatal because its lien is secured by all of the real property owned by the welfare recipient. We find this argument to be without merit. In *In re Smith*, Bankr.No. 5–80–00081 (M.D.Pa. Dec. 10, 1980), the bankruptcy court found that a lien against "all real and personal property of every kind and description" contained an inadequate description of the real property collateral and, in and of itself, precluded a finding that the lien was a security interest.[8]

Moreover, we find that the DPW's lien does not fit within the category of a security interest because it also fails to meet the fourth criteria of such an interest, i. e., it fails to evidence an intent of the parties to create a security agreement.[9] The DPW refers to the following clause contained in PA–9 (signed by the debtor) to support its contention that the requisite intent is present:

> The purpose of this agreement is to give the Department of Public Welfare a lien on any real property owned wholly or in part by me while assistance was received as above.

6. Pa.Stat.Ann. tit. 62, § 1974 (Purdon) states: Any public body or public agency may sue the owner of such property for moneys so expended, and any judgment obtained shall be a lien upon the said real estate of such person and be collected as other judgments, except as to the real and personal property comprising the home and furnishings of such person, which home shall be subject to the lien of such judgment but shall not be subject to execution on such judgment during the lifetime of the person, surviving spouse, or dependent children.

7. In particular, under the Code a security interest can be created in real property while under the U.C.C. a security interest can only be in

personal property. *See* H.R.Rep.No.95–595, 95th Cong., 1st Sess. 313–14 (1977); S.Rep.No. 95–989, 95th Cong., 2d Sess. 26 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5787, 5812.

8. *Accord, In re Griggs*, 12 B.R. 443, 445 (Bkrtcy., E.D.Pa.1981). *See also, In re Bollinger Corp.*, 614 F.2d 924, 926–27 (3d Cir. 1980).

9. *See, e. g., In re Bollinger Corp.*, 614 F.2d 924 (3d Cir. 1980); *In re Burkholder*, 11 B.R. 346 (E.D.Pa.1980); *In re Smith*, Bankr.No. 5–80–00081 (M.D.Pa. Dec. 10, 1980); *In re Porter*, 7 B.R. 356 (Bkrtcy., E.D.Pa.1980).

However, the next paragraph of the PA–9 form clearly shows that the intent of the parties is that the secured status of the DPW is to be that of a judicial lien holder rather than the holder of a security interest. That paragraph provides in pertinent part:

> In order to carry out the purpose of this agreement, I authorize the Prothonotary, or any Attorney, of any Court of Record of Pennsylvania, or elsewhere, to appear and to enter judgment against me for the sum of Two Thousand Dollars ($2,000.00), plus costs. *This judgment shall be a lien upon my real property, and be collected as other judgments.*

(Emphasis added.)

We conclude that the above language evinces an intent of the parties that the secured status of the DPW be achieved by judicial process (the confession of judgment) rather than simply by the agreement of the parties as in a security interest.

The DPW maintains, however, that its lien is a security interest which does not come into existence or attach until the occurrence of a future condition as provided in § 9–204 of the U.C.C.[10] That future condition the DPW asserts, is the step taken by the DPW to confess judgment against welfare recipients. We find this argument to be without merit for two reasons. First-ly, a security interest does not arise by virtue of recordation.[11] Rather, recordation is relevant only in determining which of several creditors with an interest in the same collateral of the debtor has priority.[12] Consequently, recordation is not a substitute for the clear evidence of an intent to create a security interest in the debtors' property as reflected in the agreement signed by the parties.[13] Secondly, the future event, which the DPW asserts triggers the existence of its lien, is the judicial process of confessing judgment against welfare recipients. Thus, the lien created thereby appears to be more a judicial lien than a security interest.

The DPW contends further, however, that under the Bankruptcy Code a security interest is any lien created by voluntary agreement of the parties while a judicial lien is only a lien created by involuntary judicial process. According to that argument, a lien which is created by voluntary judicial process (such as the lien in the instant case) is a security interest not a judicial lien. This argument was raised, and squarely rejected by us, in *In re Natale*, 5 B.R. 454, 6 B.C.D. 784, 2 C.B.C.2d 875 (Bkrtcy., E.D.Pa.1980). In that case, we held that a D.S.B. judgment created by a confession of judgment was a judicial lien not a security interest within the meaning of the Bankruptcy Code.[14] We find no rea-

---

**10.** Section 9–204 of the U.C.C. provides in pertinent part:

> (1) A security interest cannot attach until there is agreement (subsection (3) of Section 1–201) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place *unless explicit agreement postpones the time of attaching.*

Pa.Stat.Ann. tit. 12A, § 9–204 (Purdon) (emphasis added).

**11.** Comment 1 of § 9–204 of the U.C.C. states in relevant part:

> Subsection (1) states three basic prerequisites to the existence of a security interest agreement, value, and collateral. When these three coexist a security interest may, in the terminology adopted in this Article, attach. Perfection of a security interest will in many cases depend on the additional step of filing a financing statement (see Section 9–302).

**12.** *See* Pa.Stat.Ann. tit. 12A, § 9–312 (Purdon).

**13.** *See, e. g., In re Griggs*, 12 B.R. 443, 445 (Bkrtcy., E.D.Pa.1981).

**14.** In so holding, we stated:

> The Credit Union argues, however, that the lien which arose by the confession of judgment and issuance of the D.S.B. was not a judicial lien but a security interest. It contends that this is so because the parties agreed that the lien should be created. The Credit Union points to the definitions of security interest and judicial lien in the Code in support of its assertion that a security interest is a lien created by agreement of the parties while a judicial lien is a lien created by involuntary judicial process.
> We cannot agree that this interpretation of the Code. While it is true that under the Code a security interest is a lien created by agreement of the parties, a judicial lien is defined as a "lien obtained by judgment, levy,

son to change our opinion as expressed in *Natale*.[15] For all of the above reasons we reject the DPW's argument that its lien is more a security interest than a judicial lien.

The DPW asserts, in the alternative, that if we do not find its lien to be a security interest, we should conclude that it is a statutory lien rather than a judicial lien. But, the Code defines a statutory lien thus:

> "[S]tatutory lien" means lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute.

11 U.S.C. § 101(38), and the legislative history of the Code elaborates on the above definition as follows:

> The definition excludes judicial liens and security interests, whether or not they are provided for or are dependent on a statute. A statutory lien is only one that arises *automatically*, and is not based on an agreement to give a lien on a judicial action. Mechanics', materialmen's, and warehousemen's liens are examples. Tax

liens are also included in the definition of statutory lien.

H.R.Rep.No.95–595, 95th Cong., 1st Sess. 314 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 27 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5787, 5813 (emphasis added).

In the instant case, while the DPW's lien arises through statutory authority,[16] that statute itself requires that a judgment be obtained through judicial process in order for the lien to have full force and effect.[17] Consequently, the DPW lien does not arise automatically by force of statute. Rather, by the very words of the statute upon which the DPW relies, judicial process is necessary to create that lien. Therefore, the DPW lien cannot be said to be a statutory lien under the Code.[18]

As a result of the above, we conclude that the DPW lien is a judicial lien, not a security interest or a statutory lien.

## II. The Impairment of the Debtors' Exemptions.

Under § 522(f)(1), a debtor may only avoid a judicial lien which impairs an exemption to which the debtor would other-

---

sequestration, or other legal or equitable process or proceeding." We interpret that definition to include liens created by "voluntary" judicial process as well as by "involuntary" judicial process.

In the instant case no lien arose merely by the agreement of the parties (since, as we found above, the documents signed by the debtors did not constitute a security agreement). The lien in question arose by virtue of the action of the Credit Union in filing the promissory note and the statement of income and the action of the prothonotary in issuing the D.S.B. This was judicial process and the fact that the parties agreed that this should be done did not change its nature.
5 B.R. at 457–58 (footnotes omitted).

**15.** *Accord, In re Burkholder*, 11 B.R. 346 (Bkrtcy., E.D.Pa.1981); *In re Smith*, Bankr.No. 5–80–00081 (M.D.Pa. Dec. 10, 1980); *In re Porter*, 7 B.R. 356 (Bkrtcy., E.D.Pa.1980).

**16.** Pa.Stat.Ann. tit. 62, § 1974 (Purdon) provides in relevant part:
(a) Except as limited by subsection (c) hereof the real and personal property of any person

shall be liable for the expenses of his support maintenance, assistance and burial ... if such property was owned during the time such expenses were incurred or during the time such expenses were incurred from which the ownership of the property resulted.

**17.** Pa.Stat.Ann. tit. 62, § 1974 (Purdon) further provides:
Any public body or public agency may sue the owner of such property for moneys so expended, and any judgment obtained shall be a lien upon the said real estate of such person *and be collected as other judgments.* (Emphasis added.)

**18.** It is also interesting to note that under § 67(a) of the Bankruptcy Act a lien obtained by "attachment, judgment, levy, or other legal or equitable process or proceeding" was voidable and courts interpreting that section included confessed judgments within those liens. *See generally*, 4 Collier on Bankruptcy ¶ 67.08 at 117 n. 1 (14th ed. 1978).

wise be entitled.[19]  The DPW argues that its lien does not impair an exemption of the debtors because its lien imposes no personal liability on the debtors but rather its lien is limited to the debtors' real property.

■ We find this argument to be totally unpersuasive.  While we agree with the DPW that under Pennsylvania law its lien creates no personal liability on the debtors, it is equally true that § 522(f)(1) makes no distinction between a judicial lien which arises out of a personal debt and a judicial lien predicated on an obligation arising out of a debt springing from the debtors' realty.[20]  Instead, § 522(f)(1) permits a debtor to avoid *any* judicial lien which impairs an interest of a debtor in exempt property.

■ The DPW argues further, however, that its lien does not really impair the debtors' interest in their exempt real property because immediately after the debtors receive their discharge, the DPW will fix another lien on the debtors' property. However, this argument ignores the purpose and effect of the Bankruptcy Code which is to give the debtors a "fresh start".  This purpose is achieved, at least in part, by permitting debtors to avoid certain liens of their exempt property.[21]  In the case before us, if the debtors avoid the liens of the DPW and obtain a fresh start by their discharge in bankruptcy, they may be able to become financially self-sufficient and be able to remove themselves from the welfare rolls.  If that happens, the DPW will not be able to fix another lien on the debtors' real property.  Consequently, we conclude that to allow the DPW to retain its liens on the debtors' real estate will impair their exemption in that property and, therefore, the debtors may avoid the liens of the DPW pursuant to § 522(f)(1).

**19.**  11 U.S.C. § 522(f)(1).  *See* note 3 *supra.*

**20.**  *See In re Griggs,* 12 B.R. 443, 446 (Bkrtcy., E.D.Pa.1981).

**21.**  *See* H.R.Rep.No.95–595, 95th Cong., 1st Sess. 362 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 76 (1978).

**22.**  The Tenth Amendment provides: "The powers not delegated to the United States by the

### III.  The Constitutionality of Section 522(f)(1) and Considerations of Federalism.

The DPW's final argument is that the Tenth Amendment to the United States Constitution[22] and considerations of federalism bar the application of § 522(f)(1) to the DPW's liens because to apply that section to its liens would impermissibly interfere with the ability of the Commonwealth to structure its welfare assistance program which program is an integral and traditional state governmental function.  The DPW bases that argument on *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

In *National League of Cities,* the United States Supreme Court held that the Fair Labor Standards Act, which regulates minimum wages and maximum hours, could not be constitutionally extended to state and local governments.  The Supreme Court found that the Commerce Clause[23] of the United States Constitution does not give Congress the power to enact legislation "directly displac[ing] the States' freedom to structure integral operations in areas of traditional governmental functions" which the Court held included employer-employee relationships in programs traditionally conducted by the States.  *Id.* at 851–52, 96 S.Ct. at 2474.

The DPW asserts that the same rationale applies to the instant case.  Therefore, it contends that, because the application of § 522(f)(1) to avoid its liens would unduly frustrate the Commonwealth's welfare system, it would be unconstitutional to apply that section to those liens.  We disagree with the DPW's reliance on *National League of Cities* for several reasons.  First, that case dealt only with the power of Con-

Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S.Const. amend. X.

**23.**  The Commerce Clause provides that Congress shall have the power "To regulate Commerce with foreign Nations, and among the Several States."  U.S.Const. art. I, § 8, cl. 3.

gress under the Commerce Clause and not with the power of Congress under any other part of the Constitution such as the Bankruptcy Clause.[24] In several cases decided since *National League of Cities*, the Supreme Court has held that Congress' power under other portions of the Constitution may not be limited by considerations of federalism.[25]

■ Even if the analysis of *National League of Cities* is applicable to limit the power of Congress under the Bankruptcy Clause, however, we must conclude that the Tenth Amendment does not bar the application of § 522(f)(1) to avoid the liens of the DPW. In applying the analysis of *National League of Cities* to the instant case, we must make a three-step inquiry. First, we must determine whether the administration of welfare is an integral state governmental function. If it is, we must then determine whether § 522(f)(1) directly displaces the state's decision-making function in its welfare program. If there is a direct displacement, we must further determine whether the federal interest in creating and protecting a debtor's exemptions under § 522(f)(1) of the Bankruptcy Code outweighs the Commonwealth's interest in preserving its judicial lien system of welfare repayment.[26]

With respect to the first inquiry, the Supreme Court in *National League of Cities* stated that the integral state governmental functions protected by the Tenth Amendment were those "functions essential to the separate and independent existence" of the states or those "integral" and "traditional governmental functions." 426 U.S. at 851–52, 96 S.Ct. at 2474. Although those terms were not specifically defined, the Court made it clear that the states must retain the power to make decisions in their role of providing important public services.[27]

In the instant case the DPW asserts that welfare assistance has been a function of the Commonwealth for over two hundred years and is clearly a traditional state governmental function.[28] We agree with that contention. Because the Commonwealth is the sole provider of welfare assistance and because it has traditionally provided that governmental service, we conclude that the administration of the Commonwealth's welfare program does qualify as a protected state activity under the Tenth Amendment.

Our next inquiry then, is whether § 522(f)(1) of the Code directly displaces "essential governmental decisions" of the Commonwealth in the administration of its

---

**24.** The Bankruptcy Clause provides that Congress shall have the power "To establish...uniform laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4.

**25.** *See, e. g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) in which the Supreme Court held that Congress *may* affect integral state operations under § 5 of the Fourteenth Amendment. Similarly, in *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), the Supreme Court held that considerations of federalism under *National League of Cities*, do not limit Congress' power to regulate *foreign* commerce under the Commerce Clause.

**26.** Although the plurality in *National League of Cities* did not specifically adopt a balancing test approach, Mr. Justice Blackmun in his concurring opinion stated that he joined the Court's opinion with the understanding that a balancing test approach had been adopted. Since the decision of the Supreme Court in *National League of Cities*, many courts, including the United States Court of Appeals for the

Third Circuit, have adopted the balancing test approach to determine whether Federal legislation is violative of the Tenth Amendment. *See, e. g., Halderman v. Pennhurst*, 612 F.2d 84, 99 n. 21 (3d Cir. 1979) (en banc), *rev'd on other grounds*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed. 2d 694 (1981); *UTU v. Long Island Rail Road Co.*, 634 F.2d 19, 24 (2d Cir. 1980).

**27.** The plurality opinion in *National League of Cities* did state that fire prevention, police protection, sanitation, public health and parks were included in the term traditional state governmental functions. 426 U.S. at 851, 96 S.Ct. at 2474. *See also, UTU v. Long Island Rail Road Co.*, 634 F.2d 19, 25 (2d Cir. 1980) and accompanying footnotes.

**28.** In support of its contention, the DPW cites *Commonwealth v. Liveright*, 308 Pa. 35, 161 A. 697 (1932) in which the Pennsylvania Supreme Court stated that the Commonwealth's role in providing welfare assistance was the same as its role in preserving law and order.

welfare program. But here we conclude that § 522(f)(1) is not a direct displacement of the Commonwealth's function and therefore, it is not the type of federal legislation which the Supreme Court found offensive in *National League of Cities*. In that case, the Supreme Court held that the primary evil of the federal legislation therein was that it spoke "directly to the States qua States" and "operated to *directly* displace the States' freedom" to structure integral state operations. *Id.* at 847–48 and 852, 96 S.Ct. at 2472 and 2474 (emphasis added). Accordingly, it appears that the primary concern of the Supreme Court was federal legislation that places an affirmative duty or limitation on the states or federal legislation that is in direct conflict with state legislation dealing with integral state government functions.[29] In the instant case, the federal legislation at issue, § 522(f)(1) of the Code, does not speak directly to the states nor does it place any obligation on the states in contravention of state law or policy. In fact, § 522(f)(1) addresses itself solely to the debtor and, at most, only indirectly affects any state decisions regarding the structuring of welfare programs.

Even if we were to find that § 522(f)(1) does directly impair the Commonwealth's administration of the welfare program, we conclude that, on weighing the federal and state interests herein, the interest of Congress in providing debtors with a fresh start in bankruptcy outweighs the interest of the Commonwealth in preserving its system of welfare repayment through the use of judicial liens. The DPW asserts that it has over $164 million in D.S.B. judgments on property owned by welfare recipients and that the application of § 522(f)(1) to its liens could potentially cost the Commonwealth that amount of money. We disagree. The figure given by the DPW ($164 million) represents only the total amount of liens held by the DPW—it does not tell us how many of those liens are held on property

owned by welfare recipients who have filed petitions for relief under the Bankruptcy Code. That would be significant because it would show what impact § 522(f)(1) has on the DPW repayment system. In answer to this, the DPW asserts that the impact of § 522(f)(1) could be on a significant amount of its liens because if we declare § 522(f)(1) to be constitutional as applied to the DPW's liens then many welfare recipients will be encouraged to file under the Code simply to avoid those liens. We find this argument to be merely speculation and, without any evidence before us, we are unable to conclude that § 522(f)(1) has an unconstitutional impact on the DPW's liens.

The DPW has also failed to introduce any evidence as to how successful its system of utilizing judicial liens has been in obtaining repayment of welfare assistance. If, for instance, its success has been minimal then it cannot be said that the application of § 522(f)(1) to avoid the DPW liens has any significant impact on the Commonwealth's system of welfare assistance.

Although the Supreme Court in *National League of Cities* did not require a "particularized assessment of the actual impact on the States," the plurality opinion noted that the evidence submitted in that case showed a significant displacement of the states' ability to structure traditional state governmental functions. 426 U.S. at 851–52, 96 S.Ct. at 2474. The Supreme Court never suggested that pure conjecture as to the effects of federal legislation would suffice to demonstrate an impairment of a state governmental function. In light of the foregoing, we must conclude that, in the instant case, there is no evidence, but only speculation, that § 522(f)(1) would have a significant impact on the Commonwealth's ability to administer its welfare system.

Moreover, when we consider the federal interest in providing debtors with a fresh start in bankruptcy,[30] we conclude that that

---

29. *See, e. g., UTU v. Long Island Rail Road Co.*, 634 F.2d 19 (2d Cir. 1980) (federal legislation which precluded state from enforcing no-strike

provision of state law to public employees was held violative of the Tenth Amendment).

30. *See, e. g., Perez v. Campbell*, 402 U.S. 637, 648, 91 S.Ct. 1704, 1710, 29 L.Ed.2d 233 (1971);

interest outweighs the state interest herein. Furthermore, § 522(f)(1) is an integral part of the Bankruptcy Code's policy of providing debtors with a fresh start free of pre-existing debt.[31]

Furthermore, another major policy of the Code is to assure an orderly and fair distribution of a debtor's estate. In this respect, the Supreme Court stated in *United States v. Embassy Restaurant*, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959) that:

> "The broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate...." *Kothe v. R. C. Taylor Trust*, 280 U.S. 224, 227 [50 S.Ct. 142, 143, 74 L.Ed. 382] and that "if one claimant is to be preferred over others, the purpose should be clear from the statute." *Nathanson v. Labor Board*, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23.

359 U.S. at 31, 79 S.Ct. at 555 (footnote omitted). That statement is equally applicable under the Bankruptcy Code. Consequently, we conclude that if the DPW is to be treated differently from any other judicial lienholder then the Code must so state. Because Congress, in § 522(f)(1), chose to treat all judicial lienholders alike and because the Commonwealth has decided to give itself the status of a judicial lienholder, we conclude that the Commonwealth must be treated as all other judicial lienholders under § 522(f)(1) of the Code.

On the basis of the foregoing, we find that the federal interest in creating a comprehensive scheme of giving the debtors a fresh start and of providing for the orderly liquidation of the debtors' assets is demonstrably greater than the Commonwealth's interest in the preservation of its judicial lien system of welfare repayment. Accordingly, we conclude that § 522(f)(1) of

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). *Accord Harris v. Zion's Savings Bank & Trust Co.*, 317 U.S. 447, 451, 63 S.Ct. 354, 357, 87 L.Ed. 390 (1943); *Stellwagen v. Clum*, 245 U.S. 605, 617, 38 S.Ct. 215, 218, 62 L.Ed. 507 (1918); *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915).

the Code is constitutional as applied to the avoidance of the DPW's liens on the debtors' exempted real property in the instant case.

## IV. Subordination of the DPW Lien v. Avoidance Under § 522(f)(1).

The DPW makes one final argument for the preservation of its liens herein, that is, that rather than avoiding its liens completely we should simply subordinate those liens to the debtors' exemptions. Under that solution, if the debtors' real property increases in value in the future the DPW's lien would attach to that increased value. In this way, the DPW asserts that we will be protecting both the federal interest in providing the debtors with a fresh start and the state's interest in welfare repayment.

We cannot agree to do this. Firstly, to allow the DPW's lien to remain in such an inchoate form would not be in keeping with the fresh start policy of the Bankruptcy Code because it would discourage debtors from improving their residence knowing that to do so would only inure to the benefit of the Commonwealth and not to the benefit of the debtors or their family. Furthermore, we find no support whatever in the Code for the ingenious solution suggested by the DPW. Rather, § 522(f)(1) unambiguously states that judicial liens which presently impair the debtors exemptions are *avoidable*. Because we have found that the DPW liens herein fit within § 522(f)(1) we will order that those liens be avoided.

31. The legislative history to § 522 states that "Subsection (f) protects the debtor's exemptions, his discharge, and thus his fresh start by permitting him to avoid certain liens on exempt property." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 362 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 76 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5787, 5862.